# JOHN LANDRY *v.* JEROLD B. SPITZ ET AL.
## (AC 26913)

Flynn, C. J., and Rogers and Stoughton, Js.

Argued November 28, 2006—officially released June 26, 2007

*Mary E. R. Bartholic,* with whom, on the brief, was *Thomas W. Witherington,* for the appellants (defendants).

*T. J. Donohue, Jr.,* with whom, on the brief, was *Robert J. Killian, Jr.,* for the appellee (plaintiff).

*Opinion*

ROGERS, J. This case involves the interpretation of an oral settlement agreement reached in prior litigation. The defendants Lauren E. Spitz, individually and in her capacity as executor of the estate of Jerold B. Spitz,[1] and Physicians' Telephone Directory, Inc. (corporation), appeal from the judgment of the trial court concluding that they were jointly and severally liable to the plaintiff, John Landry, for damages resulting from the breach of that agreement. They claim on appeal that the court improperly (1) found a breach of the implied covenant of good faith and fair dealing that was not alleged in the complaint, (2) found that breach in the absence of an underlying contractual obligation and evidence of bad faith, (3) created a new contract term, (4) awarded damages based on a certain time period, (5) held the individual defendants liable for the obligations of Physicians' Telephone Directory, Inc., (6) applied the parol evidence rule and (7) permitted the plaintiff to submit evidence concerning his attorney's fees in a postjudgment proceeding. We agree with the defendants' fourth claim, which is that the court's damages calculation was improper, and their fifth claim, which is that the individual defendants improperly were held liable for an obligation of the corporate defendant, but we disagree with the defendants' remaining claims. Accordingly, we reverse the trial court's judgment as

---

[1] Jerold B. Spitz died on September 16, 2004, subsequent to the institution of this action. On March 10, 2005, the court granted the motion of Lauren E. Spitz, executor of the estate of Jerold B. Spitz, to substitute herself in place of the decedent as a party defendant.

to Lauren E. Spitz, both individually and in her capacity as executor of the estate of Jerold B. Spitz. As to Physicians' Telephone Directory, Inc., we remand the case for a redetermination of damages but otherwise affirm the judgment of the trial court.

The following facts and procedural history are relevant to the appeal. The plaintiff formerly owned 25 percent of the stock of the corporation. Jerold B. Spitz and Lauren E. Spitz together owned a controlling interest in, and were officers of, the corporation, and three other individuals owned minority interests. In 1996, two of those individuals brought a shareholders' derivative action[2] against the Spitzes on the basis of their allegedly improper expenditures of corporate funds. A settlement was reached just prior to the commencement of trial, and the settlement agreement was described on the record and approved by the court, *Aurigemma, J.,* on September 23, 1997.[3] Although the plaintiff was not a party to the shareholders' derivative action, his interests were contemplated by the settlement agreement, and he was present with his counsel in court when it was approved.

The basic terms of the settlement agreement, in regard to the plaintiff, were found by the court in the present action to be as follows. "Under the agreement, the plaintiff agreed to do . . . two things. First, he transferred all of his rights of stock ownership, including his voting rights, to [Jerold B.] Spitz, thereby giving up all right to any say in how [the corporation] was run. Second, he gave [Jerold B.] Spitz an option, for a period of five years, to purchase his 25 percent interest in [the corporation] at a fixed price of $1 million. The

---

[2] See General Statutes § 52-572j.

[3] Pursuant to General Statutes § 52-572j (a), a shareholders' derivative action "shall not be dismissed or compromised without the approval of the court . . . ."

five years began as of the date of the settlement agreement, September 23, 1997.

"In exchange, [the plaintiff] was to receive annual payments based on a specified percentage of gross sales [of the corporation]. He was to receive 6 percent of gross sales for pharmaceutical advertising, 3 percent of ancillary sales, 1.5 percent of 'MD sales,' and 1.5 percent of 'book sales.' The annual payments were made in arrears. [The corporation] was required to issue a certification of total sales in each category within thirty days of the end of each calendar year, and payment was issued thereafter. Payments were made only on funds actually received by [the corporation], with supplemental certifications issued for payments received by [the corporation] after the initial certification was issued."

The plaintiff received certifications and payments as contemplated by the agreement for the years 1997 through 2001.[4] In August, 2002, Jerold B. Spitz exercised his option and purchased the plaintiff's stock for $1 million. For the year 2002, the plaintiff received a certification stating that year's gross sales figures but did not receive a payment. He also did not receive a supplemental payment for a portion of the 2001 sales for which the corporation was yet to receive payment at the time of the 2001 certification. The defendants took the position that the payments were akin to dividends, and, because the plaintiff no longer was a shareholder when the payments were due to be made under the settlement agreement, he was not entitled to them, even though he had been a shareholder for a portion of the year in which the sales underlying the payments had been made.

On April 12, 2004, the plaintiff brought a one count action against the defendants alleging breach of contract. In his complaint, he set forth the terms of the

[4] Specifically, he "received payments in 1998 (for 1997), 1999 (for 1998), 2000 (for 1999), 2001 (for 2000) and 2002 (for 2001)."

settlement agreement concerning the calculation of his annual payments and the existence and exercise of the stock purchase option. The plaintiff alleged generally that the defendants' failure to pay him anything for the 2002 sales, and an additional amount based on the 2001 sales for which payment was received subsequent to that year's certification, constituted breaches of the settlement agreement. The complaint did not include a claim alleging violation of the implied covenant of good faith and fair dealing.[5] The plaintiff attached to the complaint as exhibits the September 23, 1997 transcript

[5] The plaintiff's breach of contract claim, in its entirety, is as follows: "1. The defendants entered into a Settlement Agreement with the plaintiff on September 23, 1997. (A copy of said Settlement Agreement is attached hereto as Exhibit A.)

"2. Pursuant to said Settlement Agreement, the defendants agreed to pay the plaintiff in each calendar year six percent (6%) of the gross pharmaceutical sales for advertisements; three percent (3%) of ancillary sales; one and a half percent (1 $1/2$%) of MD sales; and one and a half percent (1 $1/2$%) of book sales.

"3. Pursuant to said Settlement Agreement the defendants had an option (in their sole and exclusive determination) to purchase the plaintiff's stock, which the defendants exercised in August, 2002.

"4. In accordance with his rights under the Settlement Agreement, the defendants provided [the] plaintiff with a certification in regard to the various categories of sales which took place in calendar year 2002 in order to document his percentages for that portion of [the] 2002 proceeds that have been received by the defendants for said sales, which should be paid to the plaintiff. (A copy of said statement is appended hereto as Exhibit B.)

"5. The defendants have failed to pay any sums to the plaintiff in regard to the sales for calendar year 2002. Said action represents a breach of the Settlement Agreement reached between the parties.

"6. In addition, the defendants have failed to pay the plaintiff $24,150.00 in commissions earned from the 2001 edition which were to be due from accounts Aricept, Levaquin, and Lovenox, which were earned but not collected prior to The Little Blue Book 2001 Edition Certification dated January 30, 2002, a copy of which is attached hereto and made a part hereof as Exhibit A. The Settlement Agreement required [the] defendant[s] to pay commissions upon receipt of advertising payments and [they have] failed to do so. Said failure represents a breach of the Settlement Agreement reached between the parties.

"7. In accordance with the terms of the Settlement Agreement, the plaintiff is entitled to payment of reasonable attorney's fees for enforcing the terms of the Settlement Agreement." (Internal quotation marks omitted.)

memorializing the settlement agreement and the 2002 certification of the corporation's gross sales.

A trial to the court was held in March, 2005. In an August 18, 2005 memorandum of decision, the court, *Miller, J.*, concluded that the defendants, by withholding the payments that the plaintiff claimed were due, had breached the settlement agreement. It acknowledged that there was nothing in the agreement specifically addressing the question of whether the plaintiff was entitled to a payment in a year in which the option to purchase his stock was exercised and found further that that issue had not been discussed either during the prior litigation or subsequent to its settlement. The court reasoned, however, that the plaintiff had bargained away valuable rights in exchange for the annual payments he was to receive under the agreement. It thus found that the defendants' refusal to make those payments constituted a breach of the implied covenant of good faith and fair dealing that is part of every contract. According to the court, "[i]f the defendants were to prevail on their claim that exercise of the purchase option extinguished their obligation to pay over $240,000 to the plaintiff, the result would be that [the] plaintiff received nothing in exchange for the benefits [Jerold B.] Spitz enjoyed for the first eight and one-half months of 2002. This court finds that [the] defendants' attempt to achieve this result was a clear violation of their duty to deal with the plaintiff fairly and in good faith."

The court awarded the plaintiff total damages of $175,559.13. That amount is comprised of $24,150 remaining unpaid from [the] 2001 gross sales and $151,409.13, which represents a prorated portion of the amount the plaintiff would have received pursuant to the settlement agreement had he been a shareholder for the entire year of 2002. The court rendered judgment

in the total amount against all of the defendants, jointly and severally. This appeal followed.

## I

The defendants claim first that the court improperly decided the case on the basis of the implied covenant of good faith and fair dealing because the plaintiff did not allege a breach of that covenant in his complaint or litigate the issue of such a breach at trial. According to the defendants, the first time the plaintiff raised a claim that the covenant had been breached was in his posttrial brief, which resulted in prejudice to the defendants. We are not persuaded.

"The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise." (Internal quotation marks omitted.) *Lyons* v. *Nichols*, 63 Conn. App. 761, 764, 778 A.2d 246, cert. denied, 258 Conn. 906, 782 A.2d 1244 (2001). A complaint should "fairly put the defendant on notice of the claims against him." (Internal quotation marks omitted.) Id. Thus, a plaintiff during trial cannot vary the factual aspect of his case in such a way that it alters the basic nature of the cause of action alleged in his complaint. See *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 63, 717 A.2d 77 (1998). "In other words, [a] plaintiff may not allege one cause of action and recover upon another." (Internal quotation marks omitted.) Id.

The defendants' claim requires us to interpret the allegations of the plaintiff's complaint to determine what it fairly alleges and to compare those allegations with the court's judgment, as informed by the trial record. The interpretation of pleadings presents a question of law over which our review is plenary. *Maloney* v. *PCRE, LLC*, 68 Conn. App. 727, 746, 793 A.2d 1118 (2002).

The defendants argue that the plaintiff alleged only breach of contract in his complaint and that he raised the applicability of the implied covenant of good faith and fair dealing for the first time in his posttrial brief. According to the defendants, to establish a breach of the implied covenant of good faith and fair dealing, a party must prove, inter alia, bad faith, an element not contemplated by a standard breach of contract claim. They assert, therefore, that the court improperly found a breach on this theory because their bad faith was neither alleged nor litigated. The defendants claim that they would have defended this case differently had they known their good faith was at issue.

The relevant legal principles are well established. "[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract *must have been taken in bad faith.*" (Emphasis added; internal quotation marks omitted.) *Renaissance Management Co.* v. *Connecticut Housing Finance Authority,* 281 Conn. 227, 240, 915 A.2d 290 (2007).

Bad faith has been defined in our jurisprudence in various ways. "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or

some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 433, 849 A.2d 382 (2004). "[B]ad faith may be overt or may consist of inaction," and it may include "evasion of the spirit of the bargain . . . ." (Internal quotation marks omitted.) *Elm Street Builders, Inc.* v. *Enterprise Park Condominium Assn., Inc.*, 63 Conn. App. 657, 667, 778 A.2d 237 (2001), quoting 2 Restatement (Second), Contracts § 205, comment (d) (1981); see also 23 S. Williston, Contracts (4th Ed. Lord 2002) § 63:22, p. 508 ("a party who evades the spirit of the contract . . . may be liable for breach of the implied covenant of good faith and fair dealing" [internal quotation marks omitted]).

We have reviewed the plaintiff's complaint closely and conclude that the defendants are correct that it alleges nothing more than a disagreement between the parties as to the defendants' obligations under the settlement agreement and does not claim bad faith.[6] See footnote 5. Nevertheless, in the context of a postjudgment appeal, if a review of the record demonstrates that an unpleaded cause of action actually was litigated at trial without objection such that the opposing party

---

[6] Indeed, the plaintiff has conceded in his appellate brief that his complaint lacks allegations of bad faith. We reject his argument that such allegations are essential only when a party claims a tortious breach of the covenant of good faith and fair dealing. See, e.g., *Grand Sheet Metal Products Co.* v. *Protection Mutual Ins. Co.*, 34 Conn. Sup. 46, 375 A.2d 428 (1977); see also *Hilton Hotels Corp.* v. *Butch Lewis Productions, Inc.*, 107 Nev. 226, 233, 808 P.2d 919 (1991) (noting difference between tort and contract actions for breach of covenant). As we have explained, bad faith also is a necessary element of a claim for breach of the covenant sounding in contract. See *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, supra, 281 Conn. 240; *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, supra, 269 Conn. 433.

cannot claim surprise or prejudice, the judgment will not be disturbed on the basis of a pleading irregularity. See *Tedesco* v. *Stamford*, 215 Conn. 450, 457, 576 A.2d 1273 (1990) ("[t]he absence of a requisite allegation in a complaint that would have justified the granting of a motion to strike . . . is not a sufficient basis for vacating a judgment unless the defect has resulted in prejudice"), on remand, 24 Conn. App. 377, 588 A.2d 656 (1991), rev'd, 222 Conn. 233, 610 A.2d 574 (1992). In that circumstance, provided the plaintiff has produced sufficient evidence to prove the elements of his unpleaded claim, the defendant will be deemed to have waived any defects in notice. See id. ("judgment will not be arrested for faults in [pleadings] when facts sufficient to support the judgment have been substantially put in issue and found" [internal quotation marks omitted]). In short, "a pleading defect cannot be a basis for setting aside a judgment unless it has materially prejudiced the defendant." Id., 459. There remains the question, then, of whether the issue of the defendants' bad faith actually was litigated at trial such that it could be said that the defendants waived any objection to a pleading defect.

Our review of the trial record reveals that the plaintiff's presentation of his case was sufficient to place in issue the defendants' bad faith and, therefore, the applicability of the implied covenant of good faith and fair dealing. As the previously recited authorities indicate, the notion of bad faith encompasses a wide range of dishonest behavior, including evasion of the spirit of the bargain. "[W]hen one party performs the contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, there is a breach of the covenant of good faith and fair dealing, and hence, a breach of contract, for which damages may be recovered; reasonable or justified expectations, in turn, are to be determined by considering the various factors and

circumstances that surround the parties' relationship and thereby shape or give contour to the expectations in the first instance." 23 S. Williston, supra, § 63:22, p. 514.

The factors and circumstances surrounding the settlement agreement and, additionally, what the agreement was intended to accomplish, were a major focus of the trial in this matter. The essence of the plaintiff's claim, as is evident from his testimony, was that the defendants' discretionary interpretation of how the distribution provision should operate in the year the option was exercised was contrary to the spirit of that agreement. The plaintiff testified repeatedly as to his position that for each year the parties' agreement was in effect, he had given something of value to the defendants, namely, both the stock purchase option and the rights attendant to his stock ownership, and that he reasonably expected to receive something in return, namely, the annual distributions from the corporation's gross sales. According to the plaintiff, in failing to give him anything in exchange for his performance during a portion of 2002, the defendants were interpreting their obligations under the agreement in a manner inapposite to its purpose, in other words, in bad faith.[7]

---

[7] The plaintiff testified repeatedly and consistently in this regard. For example, on cross-examination, he described his understanding of the annual distributions as follows: "The payment I received was for two things: [it] was for me to give up my rights to do anything in the company, [and] it gave the Spitzes the right to run the company in any way they saw fit; also, I was given that money for . . . giving them an option to buy me out at any time over five years."

As to 2002, the year in which the option was exercised, he explained: "I was the holder of the stock for eight months of the year. For those eight months I gave them the right to do whatever they wanted to do with the company and also gave them the right to exercise an option to buy me out. So, I was a holder of the stock for that time period. And I also understand that we gave them the right and they paid us in arrears. So, we had to wait for the payment."

The plaintiff later reiterated: "I believe the contract is very clear that I gave up the rights for the Spitzes to run the company without having any say at all. I also gave them . . . options to buy me out over a five year

The arguments made by the plaintiff's counsel also are indicative of the plaintiff's theory that the defendants' view of their obligations ran counter to the spirit of the settlement agreement. For example, when opposing the defendants' motion to dismiss, which was considered by the court at the conclusion of the plaintiff's case, the plaintiff's counsel argued that for eight months of 2002, the plaintiff gave up all of his shareholder rights and provided the defendants with a valuable option, and that if the plaintiff received no payment in return, a significant forfeiture would be the result.

Given the foregoing, the defendants cannot claim that they were unfairly surprised that their good faith was at issue. It is clear that the plaintiff was challenging their interpretation of the agreement as contrary to the spirit of the bargain, a species of bad faith. Consequently, the defendants' first claim fails.

## II

The defendants claim next that the court improperly found a breach of the implied covenant of good faith and fair dealing in the absence of an underlying contractual obligation and evidence of their bad faith. We disagree.

We reiterate the relevant principles. A duty of good faith and fair dealing is implied into every contractual relationship, and it requires that neither party do anything to injure the other's right to receive the benefits of the contract. See *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, supra, 281 Conn. 240. "The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." (Internal quotation marks

period. For those rights, I felt that as long as they did that for eight months of that year, they owed me that money."

omitted.) Id. To establish that the covenant has been breached, a plaintiff must show that the acts by which a defendant allegedly impeded the plaintiff's right to receive reasonably expected contract benefits were taken in bad faith. Id. Most courts decline to find a breach of the covenant apart from a breach of an express contract term. 23 S. Williston, supra, § 63:22, p. 516. Stated otherwise, "the claim [that the covenant has been breached] must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty." Id.

In the absence of definitive contract language or where the relevant language is ambiguous, the court's interpretation of an agreement presents a question of fact subject to the clearly erroneous standard of review. See *Histen* v. *Histen*, 98 Conn. App. 729, 733, 911 A.2d 348 (2006). Furthermore, "whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the . . . finder of fact." 23 S. Williston, supra, § 63:22, p. 507; see also *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, supra, 281 Conn. 240 ("[w]hether a party has acted in bad faith is a question of fact").

The defendants argue that the court improperly found a breach of the covenant apart from any breach of the settlement agreement. It is undisputed, however, that the settlement agreement provided for annual distributions to "minority shareholders," one of whom was the plaintiff, to be paid to those shareholders after the close of the calendar year in which the sales underlying the distributions were made. That provision was not clear, however, in regard to how it was to apply in the event that Jerold B. Spitz exercised his stock purchase option

and, therefore, the person whose shares were purchased was a "minority shareholder" for only part of the year in which those sales were made. Clearly, it was the defendants' discretionary interpretation of this ambiguous term upon which the court imposed the requirements of the duty of good faith and fair dealing. The defendants' claim that the court found a breach of the covenant in the absence of an explicit contract term is, therefore, without merit.[8]

The defendants' claim that the court found a breach of the covenant in the absence of bad faith is equally unavailing. As we explained in part I, bad faith may include one party's performance or interpretation of the contract in a manner that evades its spirit and is unfaithful to its purpose, resulting in a denial of the justified expectations of the other party. See *Elm Street Builders, Inc.* v. *Enterprise Park Condominium Assn., Inc.*, supra, 63 Conn. App. 667; 2 Restatement (Second), supra, § 205, comment (d); 23 S. Williston, supra, § 63:22, p. 508. Substantial evidence was presented in this case concerning the course of dealings between the parties, the purpose of the settlement agreement and the resultant justified expectations of the plaintiff.[9]

[8] The defendants' argument that there is no provision requiring the corporation to make payments to former shareholders is nothing more than another way of saying that the term providing for distributions to minority shareholders is ambiguous as to its applicability to a year in which the option was exercised. The obvious response to the defendants' argument is that there also is no provision requiring stock ownership on a specific date as a prerequisite to a minority shareholder's right to receive a distribution for a particular year. Furthermore, the agreement does not define "minority shareholders" with reference to any particular point in time. In sum, the settlement agreement is ambiguous in this regard.

[9] See footnote 7. Lauren E. Spitz also testified as to what the settlement agreement was intended to accomplish, as did the Spitzes' attorney at the time of the settlement. The parties were in substantial accord that the agreement was crafted to allow Jerold B. Spitz to run the corporation as he wanted in exchange for a reasonable payout to the minority shareholders. The transcript of the settlement agreement also is indicative of this purpose.

Lauren E. Spitz testified further as to her belief that the agreement did not require any payment to the plaintiff for 2002, and Jerold B. Spitz, via

See 23 S. Williston, supra, § 63:22, p. 514. On the basis of that evidence, the court found that the defendants' discretionary interpretation of the distribution provision to deny the plaintiff any payment for 2002 was an attempt to cause a result contrary to those expectations and, thus, amounted to a dereliction of their duty to deal with the plaintiff in good faith. We conclude that the court's finding was not clearly erroneous.

III

The defendants also claim that the court improperly created a new contract term. More specifically, they argue that the court, in awarding damages representing a pro rata portion of the distribution to which the plaintiff would have been entitled had he been a stockholder of the corporation for all of 2002, effectively created a new contract term. In essence, the defendants attack the court's method of determining damages as having no explicit basis in the settlement agreement because that agreement did not overtly provide for partial year distributions. We are not convinced.

We first note the standard of review applicable to challenges to damages awards. "[T]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) *Duplissie* v. *Devino*, 96 Conn. App. 673, 699, 902 A.2d 30, cert. denied, 280 Conn. 916, 908 A.2d 536 (2006). "When, however, a damages award is challenged on the basis

affidavit, attested that only those minority shareholders who were holders of record at the end of a given year were to receive payments. The court, however, implicitly rejected Lauren E. Spitz' interpretation of the distribution provision and explicitly found that Jerold B. Spitz' affidavit was "entirely self-serving and not credible . . . ." In effect, the court found the Spitzes' interpretations of the settlement agreement to be disingenuous. This court will not revisit credibility determinations. *State* v. *Ortiz*, 95 Conn. App. 69, 81, 895 A.2d 834, cert. denied, 280 Conn. 903, 907 A.2d 94 (2006).

of a question of law, our review [of that question] is plenary." (Internal quotation marks omitted.) *Robert* v. *Scarlata*, 96 Conn. App. 19, 22, 899 A.2d 666 (2006).

The court explained that it was fashioning a remedy to award the plaintiff "that which he would have received had the defendants dealt with him fairly and in good faith." "It is axiomatic that the sum of damages awarded as compensation in a breach of contract action should place the injured party in the same position as he would have been in had the contract been performed [by the breaching party]." (Internal quotation marks omitted.) *Russell* v. *Russell*, 91 Conn. App. 619, 643, 882 A.2d 98, cert. denied, 276 Conn. 924, 925, 888 A.2d 92 (2005). To that end, the court applied the percentages agreed to in the settlement agreement to the undisputed gross sales figures in the certification provided by the defendants for 2002, just as the agreement contemplated. It then reduced the figure thus arrived at to compensate for the fact that the consideration the plaintiff had given in exchange for the distribution, i.e., the purchase option and the rights associated with his stock, had been provided for only a portion of 2002 due to the defendants' midyear exercise of the option.

We conclude that the damages award was the product of a legitimate exercise of the court's broad discretion. The award was factually supported because it was based on the 2002 certification of gross sales that was in evidence. Furthermore, it was legally correct insofar as it resulted from application of the explicit terms of the settlement agreement to the certification figures and, otherwise, was designed to give the plaintiff what he would have received had the defendants acted in good faith and not attempted to accept the benefit of several months of the plaintiff's performance of his contract obligations while providing nothing in return. We reject the defendants' characterization of the court's remedy as the effective creation of a new contract term.

Rather, the award represents the application of an explicit contract term, that providing for annual distributions, and the implied duty of good faith and fair dealing to the circumstance of only a partial year of performance by the plaintiff. The defendants' third claim fails.

IV

The defendants argue next that the court's damages award was improper because it was based on the wrong time period. The plaintiff does not contest this argument, and we agree that the time period used by the court to calculate damages lacks support in the evidence.

Again, the court's damages award presents a factual matter that we review only for clear error. *Duplissie* v. *Devino*, supra, 96 Conn. App. 699. It is well established, however, that "[d]amages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Internal quotation marks omitted.) Id. In a breach of contract action, although the injured party should receive a damages award that places him in the same position that he would have occupied had the contract been performed properly, he nevertheless "is entitled to retain nothing in excess of that sum which compensates him for the loss of his bargain. . . . Guarding against excessive compensation, the law of contract damages limits the injured party to damages based on his actual loss caused by the breach." (Internal quotation marks omitted.) *Russell* v. *Russell*, supra, 91 Conn. App. 643–44.

The court awarded damages for the portion of the year that the plaintiff retained his stock ownership because that was the time period during which he was performing his obligations pursuant to the settlement

agreement by surrendering his stock rights and providing an option. The agreement provided that the defendants could exercise the option to purchase the plaintiff's stock at any time within five years from the settlement date and that the plaintiff was required to relinquish his stock, in exchange for an established purchase price, within fifteen days of that exercise. It is undisputed that once the option was exercised, the plaintiff timely tendered the stock as required by the agreement.

The court found that the plaintiff had retained his stock for the first eight and one-half months of 2002 and calculated damages accordingly. It is this finding that the defendants now challenge. In his complaint, the plaintiff had alleged that the defendants exercised the option "in August, 2002." In their answer, however, the defendants admitted only that "in or about August 2002, [they] *purchased* the [p]laintiff's stock . . . ." (Emphasis added.) The dates of option exercise and stock purchase never were established with precision. The only evidence presented at trial regarding either of those dates was the testimony of Lauren E. Spitz, which was somewhat vague. She testified that the defendants notified the plaintiff "some time toward the end of July" that they were exercising the option and that the plaintiff was to surrender his stock within the requisite fifteen days.[10] On the pleadings and evidence, therefore, the latest the court could have found the stock to have been surrendered was mid-August, 2002, which would have resulted in a seven and one-half month period of ownership for the plaintiff for that year. The court's award based on eight and one-half months therefore was clearly erroneous such that the award must be recalculated. See *Duplissie* v. *Devino*,

---

[10] When testifying about a different matter, the plaintiff, similarly, indicated that he "was a shareholder *until* August of [2002]." (Emphasis added.)

supra, 96 Conn. App. 699 ("[t]he court must have evidence by which it can calculate the damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount" [internal quotation marks omitted]).

V

The defendants' next claim is that the court, by concluding that they were jointly and severally liable for the damages resulting from the breach of the settlement agreement, improperly held the individual defendants, Lauren E. Spitz and the estate of Jerold B. Spitz, responsible for the obligations of the corporation. Again, the plaintiff has not contested this argument in his appellate brief. We agree with the defendants that the court improperly held the individual defendants liable for the breach of a contractual obligation of the corporation.

In its memorandum of decision, the court, after determining the amount of damages due to the plaintiff, concluded that the defendants were jointly and severally liable for that amount. The court reasoned only that "[t]he individual defendants were parties to the settlement agreement and to the subsequent 'Shareholder Voting Trust and Agreement,' "[11] and, therefore, were liable along with the corporation for the plaintiff's damages. The court did not include any further analysis or authority in support of its conclusion.[12] "When legal conclusions of the trial court are challenged on appeal, we must decide whether [those] . . . conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation

[11] In or around February, 1998, Jerold B. Spitz, the plaintiff and the remaining minority shareholders executed a "Shareholder Voting Trust and Agreement" (voting trust) to implement the term of the settlement agreement providing for the transfer of the minority shareholders' stock rights to Jerold B. Spitz. We note that Lauren E. Spitz was not a party to the voting trust.

[12] The defendants did not seek an articulation in this regard. See Practice Book § 66-5.

marks omitted.) *Friezo* v. *Friezo*, 281 Conn. 166, 181, 914 A.2d 533 (2007).

It is not disputed that all of the defendants were parties to the settlement agreement that created obligations vis-a-vis the plaintiff. Under general principles of contract law, "where two or more promisors enter into an agreement with a third party for one performance, there is a presumption that the promisors are contracting jointly in the absence of words of severance in the contract . . . ." (Citation omitted; internal quotation marks omitted.) *Updike, Kelly & Spellacy, P.C.* v. *Beckett*, 269 Conn. 613, 661–62, 850 A.2d 145 (2004). It appears that the court, without explicitly acknowledging it, may have applied the foregoing presumption to the settlement agreement and found it unrebutted.[13] In other words, the court apparently held the defendants jointly responsible for the payments due to the plaintiff under the settlement agreement because that agreement lacks words of severance. Our Supreme Court has observed, however, that "[t]he question of whether two [or more] promisors [have] promise[d] the same or [rather] separate performances is distinct from the question [of] whether two promisors of the same performance are bound by joint or by several duties or by both, but the two questions are sometimes confused. The question [of] what performances are promised is entirely a question of interpretation of the promises . . . ." (Internal quotation marks omitted.) Id., 663. Furthermore, the presumption of a joint contractual duty arises only after it has been established that the multiple

---

[13] It is unclear what rationale the court employed to conclude that the individual defendants' participation in the voting trust; see footnote 12; affected their obligations under the settlement agreement. We conclude that the voting trust, which was an entirely separate agreement executed several months subsequent to the settlement agreement, has no bearing on the question of the individual defendants' liabilities under the settlement agreement. In any event, as we have noted, only one of the individual defendants was a party to the voting trust. See footnote 11.

promisors have promised the *same* performance. See id., 664.

Our review of the transcript memorializing the settlement agreement reveals nothing to indicate that the individual defendants intended to promise the same performance as the corporation under that agreement. To the contrary, in regard to the distribution provision, it is clearly stated that "[t]he agreement is that *PTD* [i.e., Physicians Telephone Directory, Inc.] will pay [the distributions] to the minority shareholders . . . ." (Emphasis added.) The transcript reflects further the agreement that "*the PTD corporation,* which will in effect be controlled virtually exclusively by [the Spitzes], will have to provide a certificate . . . within thirty days of the end of each calendar year certifying what the total sales are . . . and a check will be due for the appropriate percentage based on that certificate." (Emphasis added.) It states moreover that the payments under the agreement are "not intended to be in addition to the profits [previously flowing to the shareholders from the corporation, but are] intended to be in lieu of [those] profits."

It is clear from the recited provisions that the intent of the parties to the agreement was that the corporation, and not the individual defendants, would be responsible for the payment of the annual distributions to the minority shareholders. It was explicitly stated that the corporation would make those payments and also would provide the underlying documentation and, further, that the payments were designed to replace profits that the corporation, absent the agreement, would have been obligated to pass along to its shareholders. Although the individual defendants agreed to the settlement on the record, there is no indication that they were promising personally to perform the obligations of the corporation, as opposed to using their powers as officers and controlling shareholders to cause the corporation to

perform. "The fact that [the defendant corporate officers] acted on behalf of the company [in so agreeing] is no more than a reflection of the reality that all corporations act through individuals. It is axiomatic that while such an entity has a distinct legal life, it can act only through individuals." *KLM Industries, Inc.* v. *Tylutki*, 75 Conn. App. 27, 35, 815 A.2d 688, cert. denied, 263 Conn. 916, 821 A.2d 770 (2003).

"A corporation is a separate legal entity, separate and apart from its stockholders." *State* v. *Radzvilowicz*, 47 Conn. App. 1, 18, 703 A.2d 767, cert. denied, 243 Conn. 955, 704 A.2d 806 (1997). Absent rightful disregard of the corporate form,[14] those "stockholders are not personally liable for the acts and obligations of the corporation." *Saphir* v. *Neustadt*, 177 Conn. 191, 209, 413 A.2d 843 (1979); see also General Statutes § 33-673 (b). We conclude that the court misapplied legal principles in holding the individual defendants jointly and severally liable for the contractual obligations of the corporation and, consequently, that the judgment against the individual defendants is improper and must be reversed.

## VI

The defendants claim further that the court improperly applied the parol evidence rule because the settlement agreement was not ambiguous. We disagree.

The following additional procedural history is relevant. Prior to the start of trial, the defendants filed a motion in limine "to preclude the [p]laintiff from offering any parol evidence to vary, contradict or otherwise explain the written terms of the . . . settlement agreement . . . ." According to the defendants, the

---

[14] We note that the plaintiff did not allege or prove the requisite elements of a corporate veil piercing claim. See, e.g., *Morris* v. *Cee Dee, LLC*, 90 Conn. App. 403, 413–15, 877 A.2d 899, cert. granted on other grounds, 275 Conn. 929, 883 A.2d 1245 (2005) (appeal withdrawn March 13, 2006). Accordingly, the personal assets of the Spitzes are not available to satisfy a judgment against the corporation.

transcript of the settlement agreement was an unambiguous expression of the parties' intent as to the matters in issue. The court denied the motion, reasoning that "the question of whether a minority shareholder is entitled to an annual distribution, based on a percentage of certain gross sales of the corporation, if that shareholder sold his or her minority interest during the year . . . simply is not addressed in the agreement . . . ." Accordingly, the court concluded, the agreement was sufficiently ambiguous so as to warrant the admissibility of extrinsic evidence.

"Ordinarily, the trial court may exercise its discretion with regard to evidentiary rulings, and [those] rulings will not be disturbed on appellate review absent abuse of that discretion. . . . Because the parol evidence rule is not an exclusionary rule of evidence, however, but a rule of substantive contract law . . . the [defendants'] claim involves a question of law to which we afford plenary review." (Citation omitted; internal quotation marks omitted.) *Stamford Wrecking Co.* v. *United Stone America, Inc.*, 99 Conn. App. 1, 8–9, 912 A.2d 1044, cert. denied, 281 Conn. 917, 917 A.2d 999 (2007). Moreover, "[w]hether a contractual provision is ambiguous [also] presents a question of law" subject to plenary review. *LMK Enterprises, Inc.* v. *Sun Oil Co.*, 86 Conn. App. 302, 306, 860 A.2d 1229 (2004).

"The parol evidence rule ordinarily prohibits a court from considering extrinsic evidence in interpreting an agreement when that evidence tends to alter the explicit terms of the agreement. . . . However, [t]he parol evidence rule does not of itself . . . forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract." (Citation omitted; internal quotation marks omitted.) *Battalino* v. *Van Patten*, 100 Conn. App. 155,

167–68, 917 A.2d 595 (2007). "The operative question becomes whether parol evidence is offered to contradict the writing or to aid in its interpretation." (Internal quotation marks omitted.) *Scinto* v. *Sosin*, 51 Conn. App. 222, 242, 721 A.2d 552 (1998), cert. denied, 247 Conn. 963, 724 A.2d 1125 (1999). "[E]xtrinsic evidence is always admissible to explain an ambiguity appearing in the instrument." (Internal quotation marks omitted.) *Hare* v. *McClellan*, 234 Conn. 581, 597, 662 A.2d 1242 (1995).

We conclude that the court properly considered extrinsic evidence to determine the meaning of an ambiguous provision of the settlement agreement and that it did not utilize that evidence to vary or contradict the explicit terms of the agreement. As the court explained, the provision at issue provided for annual distributions to minority shareholders in certain percentages of gross sales but did not supply guidance as to how it should apply in the event an individual was a minority shareholder for only a part of the year in which those sales were made. The agreement did not establish a method for calculating distributions in a partial year situation, nor did it indicate that a shareholder's stock ownership on a specific day of the year was a prerequisite to that shareholder receiving a distribution based on that year's sales. In short, the distribution provision was unclear as to its proper application in the circumstances presented. The court thus properly considered extrinsic evidence not to alter or contradict the agreement but merely to explain how the distribution provision ought to operate for the year 2002. See, e.g., *Heaven* v. *Timber Hill, LLC*, 96 Conn. App. 294, 306–307, 900 A.2d 560 (2006) (court properly considered testimony that did not vary or contradict written agreement but, rather, explained meaning of undefined term).

## VII

The defendants' last claim is that the court improperly permitted the plaintiff to submit evidence as to his attorney's fees in a posttrial proceeding. This claim is meritless.

We review a trial court's rulings as to attorney's fees and the allowance of additional evidence for an abuse of discretion. See *Mangiante* v. *Niemiec*, 98 Conn. App. 567, 569–70, 910 A.2d 235 (2006); *Wasson* v. *Wasson*, 91 Conn. App. 149, 155, 881 A.2d 356, cert. denied, 276 Conn. 932, 890 A.2d 574 (2005). "Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Mangiante* v. *Niemiec*, supra, 570.

After concluding that the defendants were liable for breach of contract and determining the amount of damages, the court addressed the issue of attorney's fees. The court stated the following: "The court-approved settlement agreement clearly stated that 'reasonable attorney's fees' would be payable 'in the event suit is necessary to enforce the provision [regarding annual distribution payments].' The defendants have correctly pointed out that there is insufficient evidence before the court, at this time, to make a finding as to what a reasonable attorney's fee would be for the prevailing party. It is hardly unusual, in a case in which a party is entitled to attorney's fees, to make such determinations in a postjudgment proceeding. Indeed, until the trial has been completed and briefs have been submitted, a fair, complete determination of an appropriate

fee award is frequently not possible. Counsel will be given the opportunity to submit documentation and further briefs, if they choose to do so, on the issue of attorney's fees in this matter."

The defendants claim that the plaintiff was obligated to submit evidence of his attorney's fees before resting his case and that the court, by affording him the opportunity to litigate fees in a supplemental proceeding, abused its discretion. They argue that the court effectively gave the plaintiff a "second opportunity" to cure an evidentiary shortcoming, which resulted in prejudice to the defendants. We are not persuaded.

Practice Book § 11-21 provides that a party shall file a motion for attorney's fees with the court "within thirty days following the date on which the final judgment of the trial court was rendered. . . ." This provision by its terms necessarily contemplates posttrial proceedings for the determination of attorney's fees. We can conceive of no possible prejudice to the defendants that would result from a separate hearing for this purpose.[15] The challenged ruling is entirely in accord with Practice Book § 11-21 and, therefore, was well within the court's discretion.

The judgment is reversed as against the defendant Lauren E. Spitz, both individually and as the executor of the estate of Jerold B. Spitz, and the judgment is reversed as against the defendant Physicians' Telephone Directory, Inc., only as to the award of damages; the case is remanded with direction to render judgment for the defendant Lauren E. Spitz and for a redetermination of damages against the defendant Physicians' Telephone Directory, Inc., in accordance with law.

In this opinion the other judges concurred.

---

[15] We note that the plaintiff's complaint included a claim for reasonable attorney's fees. See footnote 5.