******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# FINANCIAL FREEDOM ACQUISITION, LLC *v.* ANN T. GRIFFIN, EXECUTRIX (ESTATE OF ANGELA C. GRIFFIN), ET AL.
## (AC 38960)

Sheldon, Mullins and Flynn, Js.

*Syllabus*

The plaintiff bank, F Co., sought to foreclose a mortgage on certain real property of the decedent. After the foreclosure action was commenced, but before trial had begun, O Co., of which F Co. was a subsidiary, was substituted as the plaintiff. Thereafter, another bank merged into O Co., and although O Co. was the surviving entity of the merger, as part of the merger it changed its name to C Co., which was never substituted as the party plaintiff. Subsequently, the trial court granted O Co.'s motion for a judgment of strict foreclosure and rendered judgment thereon, from which the defendant A, individually and as the executrix of the estate of the decedent, appealed to this court. A claimed, inter alia, that the trial court improperly rejected her special defense and counterclaim sounding in breach of the implied covenant of good faith and fair dealing. In her special defense and counterclaim, A had alleged that, in light of a provision in the note executed by the decedent that permitted the decedent's estate to avoid its obligation to repay the loan upon the decedent's death if it cooperated with F Co. in selling the subject property, F Co. breached the covenant of good faith and fair dealing when it initiated the foreclosure action instead of communicating with the executrix to facilitate such a sale. *Held*:

1. A could not prevail on her claim that the trial court improperly determined that O Co. established a prima facie case of foreclosure, which was based on her claim that because C Co., a nonparty entity, owned the note as a result of the merger, O Co. failed to produce evidence sufficient to establish that it was the holder and owner of the note; the trial court's conclusion that O Co. was the holder and owner of the note executed by the decedent was legally and factually correct, as O Co. produced the note, which was endorsed in blank, at trial, which created a rebuttable presumption that O Co. was the note's owner, and O Co.'s status as holder and owner of the note and this foreclosure action were not affected by the merger and the change of name that occurred during the pendency of the foreclosure action, as O Co.'s corporate existence and identity continued in the resulting bank, O Co.'s assets, including the decedent's note, vested in the resulting bank by operation of law and without any deed or transfer, this action was not abated, discontinued, or otherwise affected by the merger and change of name, O Co. could have substituted the resulting bank in this action, but it was not required to do so, and the change of name did not create a new corporate entity, alter the resulting bank's corporate identity, or end the resulting bank's corporate existence.

2. The trial court properly found that A failed to meet her burden of proof with respect to her special defense and counterclaim sounding in breach of the implied covenant of good faith and fair dealing; the relevant provision in the note provided that the death of the decedent was a maturity event that made the loan immediately due and payable, except if the parties extended the repayment deadline by entering into a separate written agreement within thirty days of the decedent's death that required the decedent's estate to cooperate fully with F Co. in selling the property, and the trial court properly concluded that, in the absence of such a separate written agreement extending the deadline to allow the executrix to sell the decedent's home, the relevant provision of the note did not provide for a contractual right to an extension of the deadline to sell the property, and F Co., therefore, had no obligation to undertake any action facilitating the sale of the property by the executrix, and did not breach the terms of the note by never agreeing to such an extension.

Argued April 11—officially released September 12, 2017

Action to foreclose a mortgage on certain real property owned by the named defendant et al., and for other relief, brought to the Superior Court in the judicial district of Litchfield, where the defendant John T. Griffin et al. were defaulted for failure to appear; thereafter, the named defendant et al. filed a counterclaim; subsequently, the court, *Pickard, J.*, granted the plaintiff's motion to substitute OneWest Bank, N.A., as the plaintiff; thereafter, the matter was tried to the court, *Shah, J.*; judgment for the substitute plaintiff on the complaint and the counterclaim; subsequently, the court, *Pickard, J.*, granted the substitute plaintiff's motion for a judgment of strict foreclosure and rendered judgment thereon, from which the named defendant et al. appealed to this court; thereafter, the court, *Shah, J.*, issued an articulation of its decision. *Affirmed.*

*Ronald P. Sherlock*, for the appellants (named defendant et al.).

*Michael T. Grant*, for the appellee (substitute plaintiff).

*Opinion*

MULLINS, J. In this action to foreclose a reverse mortgage, the defendants, Ann T. Griffin, in her representative capacity as executrix of the estate of Angela C. Griffin, and Ann T. Griffin, in her individual capacity, appeal from the judgment of strict foreclosure rendered in favor of the substitute plaintiff, OneWest Bank, N.A.[1] On appeal, the defendants claim that the court erred in (1) concluding that the substitute plaintiff established a prima facie case of foreclosure and (2) rejecting their special defense and counterclaim sounding in breach of the implied covenant of good faith and fair dealing. We affirm the judgment of the trial court.

In its December 10, 2015 memorandum of a decision, the trial court set forth the following facts. "[Angela C.] Griffin [(decedent)] was the owner of the real property located at 312 Milton Road, Litchfield, Connecticut (property). On or about July 23, 2008, [the decedent] executed a note and reverse annuity mortgage (mortgage) on the [p]roperty in favor of Financial Freedom Senior Funding Corporation, [a predecessor in interest to the substitute plaintiff]. . . . [The note and mortgage] established an open-ended line of credit not to exceed $692,180 ([decedent's] loan). At that time, Financial Freedom [Senior Funding Corporation] advanced $378,791 to [the decedent] to pay off a loan from Deutsche Bank, which sought to foreclose on the mortgage it held on the property. Financial Freedom [Senior Funding Corporation] obtained an appraisal at the time that valued the property at $612,709.

"[The decedent] . . . entered into the loan so that [she] could remain in the home that she had lived in for thirty years. The property is a private property that includes a colonial residence located on eleven acres of land with a pond. It has a stable and many acres of well-maintained pasture. The home was a central part of [Ann Griffin's] and [the decedent's] lives.

"Since the mortgage is a reverse annuity mortgage, no principal became due until a maturity event occurred. On April 16, 2010, [the decedent] passed away, which constituted a maturity event and rendered the balance of the loan due and payable unless there was an agreement in writing between the [named] plaintiff and certain legal representatives of [the decedent] within thirty days to cooperate fully in selling the property. The [named] plaintiff and the [executrix] had no agreement in writing to this effect, and the [executrix] did not pay the balance due upon [the decedent's] death. Thus, the nonpayment constituted a default under the mortgage. . . . The [named] plaintiff initiated the present foreclosure action in May of 2011.

"On April 30, 2010, prior to the notice of intent to foreclose, [Ann Griffin] contacted the [named plaintiff] to inform it that she intended to sell the property. The

[named plaintiff's] electronic system notes indicate that [Ann Griffin] spoke with . . . a maturities administrator . . . . They discussed repayment of the [decedent's] loan, and [Ann Griffin] indicated she planned to sell the property and use the proceeds of the sale to repay the debt. Subsequent to the conversation, [the maturities administrator] sent a cash account reverse mortgage repayment notice to [Ann Griffin]. The repayment notice informed [Ann Griffin] that the death of [the decedent] constituted a maturity event, that upon the occurrence of a maturity event the loan became due, and that [Ann Griffin] needed to discuss plans with [the named plaintiff] concerning repayment of the loan by sending in the enclosed repayment questionnaire. . . .

"On May 6, 2010, the defendant[s'] counsel faxed a correspondence, attaching the death certificate and will of [the decedent], and informing [the maturities administrator] that he was representing the defendant[s]. [Ann Griffin] was appointed executrix of [the decedent's] estate on May 17, 2010. [Ann Griffin] lacked legal authority to enter into contractual agreements on behalf of the estate until such time as she was appointed executrix.

"On or about June 17, 2010, the [executrix] entered into a listing agreement with [a realty company] for the sale of the property, with a listing price of $614,900 (listing agreement). On June 23, 2010, the defendant[s'] counsel sent a second correspondence to [the maturities administrator], which included the probate decree admitting the [decedent's] will to probate; a certified copy of the death certificate; a copy of the [decedent's] will; a certified probate certificate reflecting the appointment of [Ann Griffin] as executrix; and a signed copy of the listing agreement. The [named] plaintiff admitted to having received both written communications and attachments. The [named] plaintiff still had not received the repayment questionnaire . . . . There was no agreement in writing or any other communication that demonstrated a mutual understanding to extend the repayment date."

In addition to those facts expressly found by the trial court, the following supplemental facts, which also reasonably could have been found by the court, are relevant. Through a series of assignments and corporate restructurings, ownership of the decedent's loan changed several times. As previously explained, on July 23, 2008, the decedent executed a note and mortgage in favor of Financial Freedom Senior Funding Corporation, making it the original mortgagee and holder of the note. At the time the decedent executed the note in July, 2008, Financial Freedom Senior Funding Corporation was a subsidiary of IndyMac Bank, F.S.B. (IndyMac). The Federal Deposit Insurance Corporation (FDIC) had been appointed as receiver for IndyMac prior to the decedent's execution of the note and

mortgage.

In March, 2009, OneWest Bank, F.S.B, through its parent company, IMB HoldCo, LLC, purchased from the FDIC certain IndyMac assets, including the decedent's loan. As part of that transaction, Financial Freedom Senior Funding Corporation executed an allonge to the note, specially endorsing it to "OneWest Bank, F.S.B." The named plaintiff in this action was formed during this transaction as a subsidiary of OneWest Bank, F.S.B.

At some point after it was assigned the note, OneWest Bank, F.S.B., executed an allonge to the note, endorsing it in blank. OneWest Bank, F.S.B., then transferred the note to the named plaintiff, which held it until transferring it back to OneWest Bank, F.S.B., around July, 2011.

Around February, 2014, OneWest Bank, F.S.B., converted from a federal savings bank into a national banking association and, thus, became OneWest Bank, N.A., the substitute plaintiff.

On August 3, 2015, which was slightly more than four years after this action was commenced, but before trial had begun, IMB HoldCo, LLC, the holding company of OneWest Bank, N.A., merged with CIT Group, the holding company of a bank called CIT Bank. As part of their holding companies' merger, OneWest Bank, N.A., and CIT Bank also merged. Specifically, "CIT Bank . . . merged *into* OneWest Bank, N.A." (Emphasis added.) Although OneWest Bank, N.A., was the surviving entity of the merger with CIT Bank, OneWest Bank, N.A., as part of the merger, changed its name to "CIT Bank, N.A." "CIT Bank, N.A.," was never substituted for OneWest Bank, N.A., as the party plaintiff in this action.

Having outlined the relevant substantive facts, we now review the pertinent procedural history. The named plaintiff commenced this action in May, 2011. As previously explained, the named plaintiff was a subsidiary of OneWest Bank, N.A., which was substituted as the plaintiff in this action on September 22, 2014.

Prior to the substitution of OneWest Bank, N.A., for the named plaintiff, the defendants pleaded several special defenses. Relevant to this appeal is the defendants' special defense that the named plaintiff breached the implied covenant of good faith and fair dealing. The defendants also filed a counterclaim against the named plaintiff sounding in breach of the implied covenant of good faith and fair dealing. Although the named plaintiff was removed from this action as a plaintiff by virtue of a substitution, it still is a party to the action as a counterclaim defendant.

The case was tried to the court over the course of two days. At trial, the substitute plaintiff introduced the original note into evidence. Accompanying the note was an allonge specially endorsing the note to OneWest Bank, F.S.B., and an allonge wherein OneWest Bank, F.S.B., endorsed the note in blank. The substitute plain-

tiff also offered the testimony of Dion Kala, a vice president and foreclosure litigation manager employed by CIT Bank, N.A. In addition to working for CIT Bank, N.A., Kala also had been employed by OneWest Bank, N.A., as well as its predecessors in interest, including OneWest Bank, F.S.B., Financial Freedom Acquisition, LLC, and Financial Freedom Senior Funding Corporation. Kala provided testimony concerning the several assignments and corporate restructurings that eventually brought the note into the possession of CIT Bank, N.A.

In its memorandum of decision, the court concluded that the substitute plaintiff had established a prima facie case of foreclosure and that the defendants had failed to meet their burden of proof on their special defense and counterclaim. The defendants filed a motion for articulation, asking the trial court to identify which plaintiff the court found owns the decedent's loan. In denying that motion, the court stated: "The defendant[s] rais[e] a specious claim. The plaintiff is OneWest Bank, now known as CIT Bank, N.A., because of a legal name change." The court rendered a judgment of strict foreclosure and set a law day. This appeal followed.

I

PRIMA FACIE CASE OF FORECLOSURE

The defendants' first claim on appeal is that the trial court improperly concluded that the substitute plaintiff established a prima facie case of foreclosure. In particular, the defendants argue that the substitute plaintiff did not produce evidence sufficient to establish that it was the holder and owner of the note. According to the defendants, the substitute plaintiff's own evidence established that a "separate and different legal entity" is the owner and holder of the note. That is, as a result of a corporate merger in which the substitute plaintiff was involved after this action commenced, ownership of the note vested in a distinct entity that was never made a party to this action. Thus, the defendants argue, a nonparty entity, "CIT Bank, N.A.," owns the note, and the substitute plaintiff does not. We disagree with the defendants and conclude that their argument is flawed both in fact and in law.

We begin by setting forth our standard of review. "A plaintiff establishes its prima facie case in a mortgage foreclosure action by demonstrating by a preponderance of the evidence that it is the owner of the note, that the defendant mortgagor has defaulted on the note, and that conditions precedent to foreclosure have been satisfied. . . .

"In order to establish a prima facie case, the proponent must submit evidence which, if credited, is sufficient to establish the fact or facts which it is adduced to prove. . . . [W]hether the plaintiff has established a prima facie case [in a foreclosure action] is a question

of law, over which our review is plenary." (Citation omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *Deutsche Bank National Trust Co*. v. *Bliss*, 159 Conn. App. 483, 495–96, 124 A.3d 890, cert. denied, 320 Conn. 903, 127 A.3d 186 (2015), cert. denied,     U.S.    , 136 S. Ct. 2466, 195 L. Ed. 2d 801 (2016).

The only element of the substitute plaintiff's prima facie case that the defendants challenge on appeal is ownership of the note. Thus, we limit our review of the relevant law to the principles governing the possession and ownership of promissory notes. "Being the holder of a note satisfies the plaintiff's burden of demonstrating that it is the owner of the note because under our law, the note holder is presumed to be the owner of the debt, and unless the presumption is rebutted, may foreclose the mortgage  .  .  .  .  The possession by the bearer of a note [e]ndorsed in blank imports prima facie [evidence] that he acquired the note in good faith for value and in the course of business, before maturity and without notice of any circumstances impeaching its validity. The production of the note [endorsed in blank] establishes [the possessor's] case prima facie against the makers and he may rest there.  .  .  .  It [is] for the defendant to set up and prove the facts which limit or change the plaintiff's rights." (Internal quotation marks omitted.) Id., 496.

We now provide a review of the law governing bank mergers, which will guide our resolution of the defendants' claim that a bank merger affects the merging banks' corporate identities and, concomitantly, their ownership rights in promissory notes. Since the merger in the present case involved one banking entity merging into, and continuing as, a *national* banking association, we begin with a brief exposition of the National Bank Act, 12 U.S.C. § 21 et seq. (2012).

"[N]ational bank[ing] [associations]  .  .  .  [are] corporate entities chartered not by any State, but by the Comptroller of the Currency of the U.S. Treasury." *Wachovia Bank* v. *Schmidt*, 546 U.S. 303, 306, 126 S. Ct. 941, 163 L. Ed. 2d 797 (2006). Thus, "[t]he National Bank Act  .  .  .  governs the operations of national banking associations." *Jackson* v. *First National Bank of Valdosta*, 349 F.2d 71, 72 (5th Cir. 1965).

Pursuant to the National Bank Act, a national banking association is formed by "making and filing articles of association and an organization certificate [with the Comptroller of the Currency of the United States]  .  .  .  ." 12 U.S.C. §§ 21 and 24 (2012). A duly formed national banking association is "a body corporate," and the National Bank Act vests such an association with several enumerated "corporate powers." 12 U.S.C. § 24 (2012). These enumerated "corporate powers" include the power "[t]o make contracts" and the power "[t]o sue and be sued, complain and defend, in any court of

law and equity . . . ." 12 U.S.C. § 24 (2012).

The National Bank Act also governs mergers and consolidations of banking entities in which the surviving entity is a national banking association. See 12 U.S.C. §§ 215, 215a, and 215a-1 (2012). Specifically, that act permits, among other things, (1) the "merger" of multiple national banking associations into a single national banking association; 12 U.S.C. §§ 215a (a) and 215a-1 (a) (2012); and (2) the "consolidation" of a national banking association and a state bank into a national banking association. 12 U.S.C. §§ 215 (a) and 215a-1 (a) (2012). The type of entity that survives either a "merger" between multiple national banking associations or a "consolidation" between a state bank and a national banking association is the same—a national banking association. 12 U.S.C. §§ 215 and 215a (2012).

Mergers and consolidations, although differentiated by the National Bank Act in some respects, have identical legal ramifications for the participating entities' (1) corporate identities and (2) assets. With respect to the participants' corporate identity, "[t]he *corporate existence of each* of the consolidating [or merging] banks or [national] banking associations participating in such consolidation [or merger] *shall be* merged into and *continued* in the [resulting] national banking association and such [resulting] national banking association *shall be deemed to be the same corporation as each bank or [national] banking association participating in the consolidation [or merger]*." (Emphasis added.) 12 U.S.C. § 215 (e) (2012). That is, "[t]he resulting national bank[ing] [association] . . . shall be deemed to be *a continuation of the entity of each participating institution, the rights and obligations of which shall succeed to such rights and obligations and the duties and liabilities connected therewith*." (Emphasis added.) 12 C.F.R. § 5.33 (*l*) (1).

With respect to the participating entities' assets, "[i]n any consolidation or merger in which the resulting [association] is a national bank[ing] [association] . . . *on the effective date* of the merger or consolidation, *all assets and property (real, personal and mixed, tangible and intangible, choses in action, rights, and credits)* then owned by each participating institution or which would inure to any of them, *shall, immediately by operation of law . . . become the property of the resulting national bank[ing] [association] . . . .*" (Emphasis added.) Id., § 5.33 (*l*) (1). Thus, in a merger or a consolidation, "[a]ll rights . . . in and to every type of property . . . and choses in action shall be *transferred to and vested in the [resulting] national banking association by virtue of such consolidation [or merger] without any deed or other transfer.* The [resulting] national banking association, upon the consolidation [or merger] and *without any order or other action on the part of any court or otherwise, shall hold*

*and enjoy all rights of property . . . in the same man-ner and to the same extent as such rights . . . were held or enjoyed by any one of the consolidating [or merging] banks or [national] banking associations at the time of consolidation [or merger] . . . .*" (Empha-sis added.) 12 U.S.C. § 215 (e) (2012).

In addition to prescribing the legal ramifications of a bank merger resulting in a national banking association, the National Bank Act outlines the process by which a national banking association may change its name. See 12 U.S.C. §§ 30–32 (2012). Specifically, it provides that "[a]ny national banking association, upon written notice to the Comptroller of the Currency, may change its name, except that such new name shall include the word 'National.'" 12 U.S.C. § 30 (a) (2012). A change of name does not affect the rights and liabilities of a national banking association: "All debts, liabilities, rights, provisions, and powers of the association under its old name shall devolve upon and inure to the associa-tion under its new name." 12 U.S.C. § 31 (2012). Further-more, a change of name does not "release any national banking association under its old name . . . from any liability" or "affect any action or proceeding . . . in which said association may be or become a party or interested." 12 U.S.C. § 32 (2012).

In *In re Worcester County National Bank*, 263 Mass. 394, 161 N.E. 797 (1928), the Supreme Judicial Court of Massachusetts was asked to interpret the provisions of the National Bank Act governing consolidations and changes of name. In that case, a national banking associ-ation called Merchants National Bank of Worcester was appointed as the administrator of a decedent's estate in 1924. Id., 397. Three years later, Merchants National Bank of Worcester was consolidated with a state bank into a surviving consolidated national banking associa-tion. Id. As part of the consolidation process, the name of the surviving consolidated national banking associa-tion was changed to "Worcester County National Bank of Worcester." Id.

The question before the court was whether the national banking association's obligation to administer the decedent's estate pursuant to its appointment was affected by either (1) the consolidation or (2) the change of name. Id., 398–400. Answering that question in the negative, the court first held that the "corporate identity of the national bank[ing] [association] ha[d] continued unaffected by anything in connection with the consoli-dation." Id., 399. Despite the consolidation, the national banking association had "maintained an unbroken and unchanged identity of corporate existence . . . ." Id., 400. Second, with respect to the change of name, the court held that "[t]he simple change of name of the national bank[ing] [association] did not disturb its cor-porate identity or continuity of existence, which ha[d] remained uninterrupted." Id., 399.

Having outlined the relevant provisions of federal banking law, we now turn to Connecticut's banking law. Although Connecticut banking law applies only to banks organized under Connecticut law; see General Statutes §§ 36a-1 and 36a-2 (12); it provides guidance for determining the impact of a merger of banking entities. As an initial matter, Connecticut banking law confirms the applicability of the National Bank Act to national banking associations. See General Statutes § 36a-126 (b) (in merger of banks resulting in national banking association, resulting national banking association "shall be considered the same business and corporate entity as the constituent Connecticut bank . . . [and] as to rights, powers and duties [it] shall be a federal bank"). With respect to a banking merger resulting in a Connecticut bank, Connecticut law provides that (1) "the corporate existence of the constituent banks shall be continued by and in the resulting bank"; (2) "the entire assets . . . of each of the constituent banks shall be vested in the resulting bank without any deed or transfer"; (3) "[n]o suit, action or other proceeding pending at the time of the merger . . . before any court or tribunal in which any of such constituent banks is a party shall be abated or discontinued because of such merger . . . but may be continued and prosecuted to final effect by or against the resulting bank"; and (4) "[t]he resulting bank shall have the right to use the name of any of the constituent banks . . . ." General Statutes § 36a-125 (g).

With federal and state banking law in mind, we seek additional guidance from the corporate law of this state and other jurisdictions relating to mergers and changes of name of *nonbanking* entities. In a merger of corporations governed by Connecticut law, "[a]ll property owned by, and every contract right possessed by, each corporation that merges into the survivor . . . vest[s] in the survivor without reversion or impairment." General Statutes § 33-820 (a) (4). Furthermore, the "name of the survivor *may, but need not be*, substituted in any pending proceeding for the name of any party to the merger whose separate existence ceased in the merger." (Emphasis added.) General Statutes § 33-820 (a) (5). Regarding the effect of a Connecticut corporation's change of name, our law provides: "An amendment to the certificate of incorporation *does not affect* . . . a proceeding to which the corporation is a party . . . . An amendment changing a corporation's name *does not abate a proceeding brought by or against the corporation in its former name*." (Emphasis added.) General Statutes § 33-803.

Connecticut's corporate law is substantially similar to the provisions of the American Bar Association's Model Business Corporation Act; see, e.g., *Trevek Enterprises, Inc.* v. *Victory Contracting Corp.*, 107 Conn. App. 574, 583 n.4, 945 A.2d 1056 (2008) ("[i]n

1994, the General Assembly enacted . . . a comprehensive revision . . . designed to bring our corporations statutes into conformity with the American Bar Association's revised Model Business Corporation Act"); which has been adopted in full or in substantial part by at least thirty other states. *Shawnee Telecom Resources, Inc.* v. *Brown*, 354 S.W.3d 542, 553 (Ky. 2011). Indeed, the provisions of the Model Business Corporation Act relating to the effect of corporate mergers and changes of name are nearly identical to Connecticut law. See Model Business Corporation Act, § 11.07 (a), p. 11-89 ("[A]ll property owned by, and every contract right possessed by, each corporation or eligible entity that merges into the survivor is vested in the survivor without reversion or impairment . . . . [Furthermore] the name of the survivor may, but need not be, substituted in any pending proceeding for the name of any party to the merger whose separate existence ceased in the merger . . . ."); Model Business Corporation Act, § 10.09, p. 10-70 ("An amendment to the articles of incorporation does not affect . . . a proceeding to which the corporation is a party . . . . An amendment changing a corporation's name does not abate a proceeding brought by or against the corporation in its former name.").

Mergers of corporations and mergers of limited liability companies are treated similarly under Connecticut law.[2] When Connecticut limited liability companies merge, "[a]ny property, real, personal and mixed, and all debts due on whatever account . . . and all other choses in action . . . belonging to or due to each party to the merger . . . *vest*[*s*] *in the survivor without further act or deed*." (Emphasis added.) General Statutes § 34-197 (4). Furthermore, any "proceeding pending by or against any limited liability company that was a party to the merger . . . *may be prosecuted as if such merger . . . had not taken place, or* the survivor *may be* substituted in the action." (Emphasis added.) General Statutes § 34-197 (6).[3] The Uniform Limited Liability Company Act similarly provides that "all property of each merging entity vests in the surviving entity" and that "the name of the surviving entity may be substituted for the name of any merging entity that is a party to any pending action or proceeding . . . ." Unif. Limited Liability Company Act § 1026 (a) (amended 2013), 6C U.L.A. 189 (2016). The rationale behind not requiring the substitution of the surviving entity's name in a pending proceeding is that "[s]uch a substitution has no substantive effect because, whether or not the survivor's name is substituted, the survivor succeeds to the claims of any party to the merger whose separate existence ceased as a result of the merger." Unif. Limited Liability Company Act § 1026 (a) (7), comment, supra, 6C U.L.A. 191. Regarding the change of a limited liability company's name, Connecticut law provides that "amend[ing] the name set forth in [the] articles of organization . . .

[does not] dissolv[e] or otherwise chang[e] the legal entity itself." *David Caron Chrysler Motors, LLC* v. *Goodhall's, Inc.*, 304 Conn. 738, 746 n.8, 43 A.3d 164 (2012).

With banking law and corporate law as our legal backdrop, we turn to the present case to determine whether the trial court properly concluded that the substitute plaintiff was the holder and owner of the promissory note executed by the decedent. Our review of the record leads us to conclude that the court's determination was legally and factually correct. At trial, the substitute plaintiff, an entity called OneWest Bank, N.A., produced the decedent's note, which had been endorsed in blank. The note was admitted into evidence during the testimony of Kala, who, at the time, was working for an entity called CIT Bank, N.A., and who previously had worked for the substitute plaintiff and the named plaintiff. Kala testified that the decedent's note currently was in the possession of "CIT Bank, N.A." According to Kala, "CIT Bank, N.A." was the name of the entity surviving the merger in which (1) CIT Bank merged *into* OneWest Bank, N.A., and (2) OneWest Bank, N.A., changed its name to "CIT Bank, N.A."

Accordingly, the evidence presented at trial revealed that the name of the entity holding the note, "CIT Bank, N.A.," did not match the substitute plaintiff's name, "OneWest Bank, N.A." As previously explained, this discrepancy, which is the basis for the defendants' challenge to the substitute plaintiff's ownership of the note, was the result of a corporate merger during the pendency of the present action to which the substitute plaintiff was a party. Kala's uncontroverted testimony established that a bank called "CIT Bank" merged *into the substitute plaintiff*, which had been a national banking association prior to the merger. Thus, the type of entity surviving the merger also was a national banking association. Despite the uncertainty surrounding the substitute plaintiff's name and corporate identity caused by the merger, the trial court concluded that the substitute plaintiff was the holder and owner of the decedent's note.

Our comprehensive review of federal and state banking law and state corporate law convinces us that the merger and change of name involving the substitute plaintiff did not affect its status as holder and owner of the decedent's note. Under the relevant federal and state authority, the merger to which the substitute plaintiff was party had the following consequences.

First, the substitute plaintiff's corporate existence and identity continued in the resulting bank. See 12 U.S.C. § 215 (e) (2012); 12 C.F.R. § 5.33 (*l*) (1); General Statutes § 36a-125 (g). Second, the substitute plaintiff's assets, including the decedent's note, vested in the resulting bank by operation of law and without any deed or transfer. See 12 U.S.C. § 215 (e) (2012); 12 C.F.R.

§ 5.33 (*l*) (1); General Statutes §§ 34-197 (4) and 36a-125 (g); Model Business Corporation Act, supra, § 11.07 (a), p. 11-89; Unif. Limited Liability Company Act § 1026 (a), supra, 6C U.L.A. 189. Third, the present action, which was pending at the time of the merger's consummation, was not abated, discontinued, or otherwise affected. See 12 U.S.C. § 32 (2012); General Statutes §§ 36a-125 (g), 33-820 (a) (5), and 34-197 (6); Model Business Corporation Act, supra, § 11.07 (a), p. 11-89; Unif. Limited Liability Company Act § 1026 (a) (7), comment, supra, 6C U.L.A. 191. Last, the substitute plaintiff could have substituted the resulting bank in this action, but it was not required to do so. See General Statutes §§ 36a-125 (g), 33-820 (a) (5), and 34-197 (6); Model Business Corporation Act, supra, § 11.07 (a), p. 11-89; Unif. Limited Liability Company Act § 1026 (a), supra, 6C U.L.A. 189. Thus, the substitute plaintiff's status as holder and owner of the note and this proceeding were not affected by the merger.

Similarly, the resulting bank's change of name affected neither this proceeding nor the substitute plaintiff's status as holder and owner of the note. As a matter of law, the change of name did not (1) create a new corporate entity; (2) alter the resulting bank's corporate identity, which merely was a continuation of the substitute plaintiff's corporate identity; (3) end the resulting bank's corporate existence, which merely was a continuation of the substitute plaintiff's corporate existence; or (4) divest the resulting bank of the substitute plaintiff's assets, which had vested in the resulting bank as a result of the merger. See 12 U.S.C. §§ 30, 32, and 215 (e) (2012); General Statutes § 36a-125 (g); *In re Worcester County National Bank*, supra, 263 Mass. 399–400.

Furthermore, the change of name did not abate, discontinue, or otherwise affect this proceeding, and it did not *require* the substitute plaintiff to substitute the resulting bank's new name in this proceeding. See 12 U.S.C. § 32 (2012); General Statutes §§ 33-803, 33-820 (a) (5), 34-197 (6), and 36a-125 (g); *In re Worcester County National Bank*, supra, 263 Mass. 399; Model Business Corporation Act, supra, § 10.09, p. 10-70.

In light of the foregoing, we conclude that the substitute plaintiff's production of the decedent's note endorsed in blank, like in any other foreclosure action, created a rebuttable presumption that the substitute plaintiff was the note's owner. See *Deutsche Bank National Trust Co.* v. *Bliss*, supra, 159 Conn. App. 496. It was incumbent on the defendants then to marshal facts rebutting that presumption. See id. For the reasons already identified, the merger and change of name of which the defendants complain do not call into question the substitute plaintiff's ownership of the decedent's note.[4] Thus, on the basis of the record before us, we conclude that the substitute plaintiff established, and

the defendants did not rebut, that the substitute plaintiff owned the note.

In exercising plenary review over the defendants' claim, we conclude that the court's determination that the substitute plaintiff owns the decedent's note was factually and legally correct. Accordingly, we conclude that the court properly concluded that the substitute plaintiff established a prima facie case of foreclosure.

II

THE DEFENDANTS' SPECIAL DEFENSE AND COUNTERCLAIM

The defendants' second claim is that the trial court erroneously found that the defendants failed to meet their burden of proof with respect to their special defense and counterclaim sounding in breach of the implied covenant of good faith and fair dealing. Specifically, the defendants argue that a provision in the note executed by the decedent permitted the decedent's estate to avoid its obligation to repay the loan upon the decedent's death if it cooperated with the named plaintiff in selling the decedent's property. In light of that provision, the defendants contend, the covenant of good faith and fair dealing implied into the note required the named plaintiff, upon the decedent's death, to communicate with the executrix for the purpose of facilitating the sale of the decedent's property. Thus, according to the defendants, the named plaintiff breached the covenant of good faith and fair dealing when it initiated a foreclosure action and filed a lis pendens instead of communicating with the executrix to facilitate such a sale. We disagree.

The following additional facts and procedural history are necessary to our resolution of the defendants' second claim. In response to the named plaintiff's foreclosure complaint, the defendants filed a special defense and a counterclaim alleging that the named plaintiff breached the covenant of good faith and fair dealing implied into the note. In particular, the defendants predicated their theory of the breach of the covenant of good faith and fair dealing on the provision in the note establishing the date on which repayment of the loan was due. That provision, § 6 of the note, provided in relevant part: "All amounts owed under this Agreement become due and payable . . . upon the first occurrence of a Maturity Event . . . unless [the decedent] default[s] . . . . [The decedent] must repay the outstanding balance in one large or 'balloon' payment upon the occurrence of a Maturity Event or, if sooner, [when the decedent defaults]."

Pursuant to that provision, the death of the decedent generally constituted a "Maturity Event" requiring immediate repayment of the loan. The provision also permitted, however, the named plaintiff and the decedent's estate to extend the repayment date upon the

decedent's death: "If [the decedent's] administrator, devisees, estate, executors, heirs, legatees or personal representative . . . agree[s] with [the named plaintiff] in writing within thirty (30) days after the death of the [decedent] . . . then repayment . . . will not be due until six months after the death of the [decedent], or such other date as may be provided in that written agreement . . . ." In the event that the parties entered such a written agreement, the decedent's estate also would have to promise in that agreement "to cooperate fully with [the named plaintiff] in selling the Property, including listing the Property for sale, caring for the Property and making any necessary repairs to the Property prior to its sale . . . ."

With the relevant contractual provisions in mind, the thrust of the defendants' allegations in their special defense and counterclaim are as follows. Section 6 of the note provided that, upon the decedent's death, the executrix had two options—immediately repay the loan or cooperate with the named plaintiff in selling the decedent's property. If the executrix elected the second option, repayment of the loan would not be due until six months after the decedent's death or on whatever date to which the parties agreed. The executrix elected to cooperate in selling the property. Specifically, she maintained the property, made repairs to the property, obtained appraisals of the property, and listed the property for sale with a real estate agency. Thus, since the executrix chose to cooperate with the named plaintiff in selling the property, the named plaintiff was not entitled to immediate repayment of the loan and it had to communicate with the executrix to facilitate the property's sale. Failing to communicate with the executrix for that purpose, and instead filing a foreclosure action and a lis pendens, the named plaintiff failed to act in good faith and deal fairly with the executrix.

At trial, the parties introduced evidence of various correspondences that they had with each other following the decedent's death on April 16, 2010. On April, 30, 2010, the named plaintiff sent the decedent's estate a letter informing it that the "loan is due and payable." On that same day, a telephone conversation, the contents of which were disputed by the parties, occurred between Ann Griffin and an employee of the named plaintiff. The testimony of the named plaintiff's employee, which was corroborated by tracking notes of the conversation maintained by the named plaintiff, indicated that she informed Ann Griffin that the estate had three months to repay the loan. Ann Griffin denied that the named plaintiff's employee informed her that the loan had to be repaid within three months. On May 6, 2010, the defendants' attorney sent the named plaintiff a copy of the decedent's death certificate and will. On June 23, 2010, the defendants' attorney sent the named plaintiff a copy of the probate court's decree, a probate certificate reflecting Ann Griffin's appointment as exec-

utrix of the decedent's estate, and a copy of an agreement between the decedent's estate and a real estate agent to list and sell the decedent's property. On July 7, 2010, the executrix informed the named plaintiff that she had listed the decedent's property for sale. On July 21, 2010, the named plaintiff sent the executrix a Notice of Intent to Foreclose, requiring that she repay the loan within thirty days. On July 29, 2010, the defendants' attorney sent a letter to the named plaintiff responding to the named plaintiff's Notice of Intent to Foreclose. In that letter, the defendants' attorney warned that initiating foreclosure proceedings "would constitute a patent breach of the contractual obligations" because the loan agreement provided that "repayment of the loan is not required until six months after the death of [the decedent]," and the defendants "fully cooperated . . . as required by the [loan agreement]." On August 6 and September 8, 2010, the executrix again called the named plaintiff, informing it that the property still was on the market.

The trial court concluded that the defendants failed to meet their burden of proof with respect to their special defense and counterclaim sounding in breach of the implied covenant of good faith and fair dealing. Specifically, it reasoned that the defendants' "special defense and counterclaim . . . [sought] to enforce nonexistent obligations under the [note]." Moreover, it found that there was no written agreement between the named plaintiff and the defendants extending the repayment due date and that there was no meeting of the minds between the parties regarding a repayment extension.

With these additional facts in mind, we begin our analysis of the defendants' second claim by setting forth the relevant legal principles. "[W]ith any issue of contract interpretation, we begin with the language of the contract." *Poole* v. *Waterbury*, 266 Conn. 68, 90, 831 A.2d 211 (2003). "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract." (Citation omitted; internal quotation marks omitted.) Id., 88–89.

"[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's

discretionary application or interpretation of a contract term. . . .

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Internal quotation marks omitted.) *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 794–95, 67 A.3d 961 (2013).

Critically, our Supreme Court has stated that the covenant of good faith and fair dealing "is not implicated by conduct that does not impair contractual rights." Id., 795. "In *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, [281 Conn. 227, 240, 915 A.2d 290 (2007)], for example, [the Supreme Court] held that the defendant housing authority's refusal to accept mortgage prepayments, in order to facilitate new loans for owners of low income housing, did not violate the covenant of good faith and fair dealing when the agency was not contractually obligated to accept prepayments. In so holding, we reasoned that [t]he covenant of good faith and fair dealing presupposes the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." (Emphasis omitted; internal quotation marks omitted.) *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 795.

Indeed, we previously have observed that "[m]ost courts decline to find a breach of the covenant apart from a *breach of an express contract term*. . . . Stated otherwise, the claim [that the covenant has been breached] must be tied to an alleged breach of a specific contract term . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) *Landry* v. *Spitz*, 102 Conn. App. 34, 47, 925 A.2d 334 (2007); see also *Forte* v. *Citicorp Mortgage, Inc.*, 90 Conn. App. 727, 733–34, 881 A.2d 386 (2005) (mortgagee did not violate covenant of good faith and fair dealing by failing to allow mortgagor to refinance "because the note and the mortgage [did] not guarantee or discuss any right to refinance"); *Southbridge Associates, LLC* v. *Garofalo*, 53 Conn. App. 11, 15, 17, 728 A.2d 1114 (covenant of good faith and fair dealing not implicated by mortgagee's refusal to sell note to mortgagor because "loan documents [did] not contain a provision requiring a holder of the notes and mortgages to negotiate with

or sell the notes to [mortgagor] prior to enforcing its foreclosure rights"), cert. denied, 249 Conn. 919, 733 A.2d 229 (1999).

In the present case, the defendants' theory of breach of the covenant of good faith and fair dealing is predicated on the provision in the note prescribing the date on which repayment of the loan was due. In construing that provision, the trial court concluded that it did not *obligate* the named plaintiff to extend the repayment due date. Our construction of that provision conforms to the trial court's construction.

Our plenary review of the relevant contractual language reveals the following. The provision first sets out a general rule: The death of the decedent is a maturity event that makes the loan immediately due and payable. It subsequently provides, however, an exception to that general rule: "*If* [the decedent's estate] . . . agree[s] *with* [*the named plaintiff*] *in writing* within thirty . . . days after the [decedent's] death . . . to cooperate fully with [the named plaintiff] in selling the Property . . . then repayment . . . will not be due until six months after the [decedent's] death . . . or such other date as may be provided *in that written agreement* . . . ." (Emphasis added.) Thus, the unambiguous language of the provision *permits*, but does not require, the parties to extend the repayment deadline *by entering into a separate written agreement*.

The defendants' interpretation of the repayment provision belies the plain, unambiguous meaning of the provision's language. The defendants mistakenly construe the provision as granting the executrix a right to unilaterally extend the repayment deadline and as imposing upon the named plaintiff an obligation to honor the executrix's unilateral decision to extend the deadline. The provision guarantees no such right to the executrix and imposes no such obligation on the named plaintiff. The fact that the provision uses the terms "agree" and "agreement" with respect to an extension indicates that such an extension can be created only by the parties' *mutual assent*. See Black's Law Dictionary (10th Ed. 2014) (defining "agreement" as "manifestation of mutual assent by two or more persons" and "agree" as act of "exchang[ing] promises").

Thus, in the absence of a written agreement extending the deadline to allow the executrix to sell the decedent's home, the named plaintiff had no obligation to undertake any action facilitating the executrix's sale of the property, e.g., communicating with the executrix regarding the sale. As previously explained, the trial court found that there was no evidence that the parties entered into such a written agreement. After reviewing the record, we conclude that this finding is not clearly erroneous. Indeed, a review of all of the correspondences between the parties reveals that there is no document that fairly can be characterized as a

written agreement wherein *both* parties agree to extend the repayment deadline. The record discloses that the executrix certainly represented to the named plaintiff that she was maintaining the property and planning on selling it, but it does not disclose that the named plaintiff agreed in writing to extend the repayment deadline.

In light of the foregoing, we conclude that the defendants' special defense and counterclaim sounding in breach of the covenant of good faith and fair dealing must fail. The special defense and counterclaim are not predicated on a breach of an express term in the note; *Landry* v. *Spitz*, supra, 102 Conn. App. 47; and the named plaintiff's conduct did not impair any contractual right of the decedent or her estate. *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 795. That is, the note guaranteed no contractual right to an extension to sell the property, and, consequently, the named plaintiff did not breach the terms of the note by never agreeing to such an extension.

Moreover, since it properly never agreed to an extension, the named plaintiff was not obligated to take any action facilitating the executrix's sale of the property pursuant to a *nonexistent* extension agreement. In doing so, the named plaintiff retained its right under the note to receive immediate repayment of the loan upon the decedent's death. Thus, by initiating foreclosure proceedings and filing a lis pendens, the named plaintiff merely was enforcing *its* contractual rights, not acting in bad faith to impair the rights of the decedent and her estate. Accordingly, we conclude that the trial court properly rejected the defendants' counterclaim and special defense based on a breach of the covenant of good faith and fair dealing.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] A brief explanation of the numerous parties involved in this action is necessary. Regarding the plaintiffs, this action was commenced by Financial Freedom Acquisition, LLC. The successor in interest to Financial Freedom Acquisition, LLC, OneWest Bank, N.A., subsequently was substituted for Financial Freedom Acquisition, LLC. Although Financial Freedom Acquisition, LLC, was removed from this action as a plaintiff, it still is a party to the action as a counterclaim defendant. Thus, throughout this opinion, we refer to OneWest Bank, N.A., as the substitute plaintiff and Financial Freedom Acquisition, LLC, as the named plaintiff and counterclaim defendant.

Regarding the defendants, the named plaintiff brought this action against seven defendants. Five of the defendants, John T. Griffin, Mary K. Griffin, Thomas V. Griffin, Pauline Griffin Voghel, and the Connecticut Department of Revenue Services, are nonappearing. The two appearing defendants are Ann T. Griffin, in her individual capacity, and Ann T. Griffin, in her capacity as executrix of the estate of Angela C. Griffin. In this opinion, we use "Ann Griffin" to refer to Ann T. Griffin in her individual capacity, "the executrix" to refer to Ann T. Griffin in her capacity as executrix, and "the defendants" to refer to Ann T. Griffin in both her individual and representative capacities.

[2] Mergers of partnerships also receive similar treatment under Connecticut law. See General Statutes § 34-33f (in merger of limited partnerships, "all property, real, personal and mixed . . . . and choses in action . . . shall be vested in [surviving] limited partnership without further act or deed," and any "action or proceeding . . . pending . . . against [one of the merging entities] may be prosecuted as if such merger or consolidation had not taken place, or . . . [the] survivor may be substituted in its place"); General

Statutes § 34-389 (a) (in merger of limited liability partnerships, "[a]ll property owned by each of the merged partnerships vests in the survivor," and "[a]n action or proceeding pending against a partnership that is a party to the merger may be continued as if the merger had not occurred, or the survivor may be substituted as a party to the action or proceeding").

[3] Number 16-97 of the 2016 Public Acts repealed the Connecticut Limited Liability Company Act, § 34-100 et seq., effective July 1, 2017. On the effective date, the Connecticut Uniform Limited Liability Company Act replaced the Connecticut Limited Liability Company Act. With respect to the provisions governing the effect of mergers, the repealed act and the Uniform Act do not differ substantially. See Public Acts 2016, No. 16-97, § 91 (a) ("[w]hen a merger becomes effective . . . [a]ll property owned by each merging limited liability company that ceases to exists vests in the surviving limited liability company . . . [and] [a]n action or proceeding pending . . . against any merging limited liability company that ceases to exist may be continued as if the merger had not occurred").

[4] The defendants also draw our attention to another aspect of the merger at issue that supposedly calls into question the substitute plaintiff's ownership of the note. Specifically, the defendants argue that the trial court erred in failing to address how the substitute plaintiff's ownership of the note was affected by the fact that the merger also involved the acquisition of the substitute plaintiff's parent company by CIT Bank's parent company. We fail to see how this aspect of the merger undermines the substitute plaintiff's ownership of the note.

There is nothing in the record suggesting that the merger caused the substitute plaintiff to relinquish its status as an entity legally separate from its parent company, whoever that might have been after the merger. *SFA Folio Collections*, *Inc.* v. *Bannon*, 217 Conn. 220, 232, 585 A.2d 666 ("it is a fundamental principle of corporate law that the parent corporation and its subsidiary are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary"), cert. denied, 501 U.S. 1223, 111 S. Ct. 2839, 115 L. Ed. 2d 1008 (1991). Indeed, the record reveals that the substitute plaintiff merged with *another subsidiary*, CIT Bank, *not the parent company* of CIT Bank. Furthermore, as previously explained, notwithstanding the change of name, the substitute plaintiff survived the merger because CIT Bank merged *into* the substitute plaintiff. Regardless of whose subsidiary the substitute plaintiff became as a result of the merger, it remained "a separate legal entity possessing its own separate assets and liabilities." *Capital Parks*, *Inc.* v. *Southeastern Advertising & Sales Systems*, *Inc.*, 30 F.3d 627, 629 (5th Cir. 1994); see also *Wright* v. *JPMorgan Chase Bank*, *N.A.*, 169 So. 3d 251, 252 (Fla. App. 2015) ("[a]s a separate legal entity, a parent corporation . . . cannot exercise the rights of its subsidiary" [internal quotation marks omitted]). The rule that the assets of a parent company and its subsidiary are separate has obvious implications in the foreclosure context. That is, "ownership of the note by [a] subsidiary . . . does not give [a] parent corporation . . . the right to enforce the note . . . ." *Wright* v. *JPMorgan Chase Bank*, *N.A.*, supra, 252. Accordingly, we are convinced that the substitute plaintiff, not its parent's company, owns the note and is the proper plaintiff in this foreclosure action.

————————————————