******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

*Syllabus*

The plaintiff sought to recover damages from the defendant for breach of
contract in connection with a real estate contract in which the plaintiff
agreed to purchase from the defendant certain residential units. The
real estate contract required the plaintiff to obtain mortgage financing
by a certain date and mandated that the defendant provide to the plaintiff
various documents, to the extent such documents were existing and
available. The defendant did not supply all of the documents requested
by the plaintiff because certain documents did not yet exist. The closing
date expired and the plaintiff never obtained mortgage financing. The
plaintiff commenced this action alleging that the defendant breached
the implied covenant of good faith and fair dealing by failing to provide
it with the necessary documents for it to obtain mortgage financing and
by retaining the plaintiff's deposit without intent to transfer title to the
units. The defendant impleaded B Co. into the action by way of a third-
party complaint. B Co. and the defendant had attempted to enter into
a property management agreement. B Co., however, did not exist as a
corporate entity on the date that the agreement was executed. P, a
manager of B Co., signed the agreement, despite the fact that P was
not a party to the agreement. B Co. filed a third-party counterclaim
against the defendant alleging that the defendant breached the manage-
ment agreement and was unjustly enriched when it failed to pay B Co.
for all of its services. After a trial to the court, the trial court found in
favor of the defendant as to the plaintiff's claim alleging breach of the
implied covenant of good faith and fair dealing, concluding that the
defendant had no obligation to provide the plaintiff with documents
that did not exist. The court rendered judgment in favor of the defendant
as to B Co.'s breach of contract claim on the ground that the management
agreement was a "nullity" because B Co. did not exist when the manage-
ment agreement was executed. The plaintiff and B Co. appealed from
the trial court's judgment, and, while that appeal was pending, the
plaintiff filed a motion to open the trial court's judgment on the ground
that the defendant engaged in fraud by concealing that it had sold the
residential units to another entity for a higher price. The court denied
the motion, reasoning that, even if the plaintiff's contentions were true,
this would not have affected its determination that the defendant per-
formed its obligations under the contract, and the plaintiff filed a sepa-
rate appeal to this court, which consolidated the appeals. *Held*:

1. The plaintiff could not prevail on its claim that the trial court improperly
   rendered judgment in favor of the defendant on the plaintiff's claim
   alleging that the defendant breached the implied covenant of good faith
   and fair dealing, which was based on its claim that the court incorrectly
   determined that the defendant did not act in bad faith by failing to
   provide to the plaintiff the documents necessary for it to obtain mortgage
   financing and by accepting the plaintiff's deposit without the intent to
   transfer title to the residential units: the court determined that the
   defendant did not act in bad faith by failing to provide the plaintiff with
   documents to secure financing that did not exist, the agreement does
   not mandate that the defendant create nonexistent documents, rather,
   the agreement mandates the opposite, namely, that the defendant must
   provide the plaintiff with documents that are existing and available;
   moreover, the defendant did not act in bad faith by retaining the plain-
   tiff's deposit because the agreement permitted the defendant to retain
   the deposit in the event that the plaintiff defaulted, and it was undisputed
   that the plaintiff defaulted on its obligations because it did not obtain
   mortgage financing to comply with the agreement.

2. This court declined to review B Co.'s claim that the trial court improperly

rendered judgment in favor of the defendant on B Co.'s breach of contract counterclaim, which was based on its claim that the court incorrectly determined that the management agreement between B Co. and the defendant was a nullity: the trial court did not review any of the fact bound arguments made by B Co. in support of its claim that it was able to enforce the agreement against the defendant, and, therefore, the record was inadequate for this court to consider B Co.'s arguments because the court never made the requisite determination as to the issues of P's capacity, as to P's assignment of the agreement and the defendant's ratification of the agreement, and B Co. failed to seek reargument or an articulation as to any of these grounds; moreover, although B Co. lacked the capacity to enter into the management agreement because it did not exist as a corporate entity at the time the agreement was executed, B Co.'s lack of capacity did not, by itself, render the agreement a nullity, as the management agreement may have been enforceable between P and the defendant if P had the capacity to execute the agreement on behalf B Co., however, the issue of P's capacity was not determined by the court, which determined only that the agreement was a nullity because B Co. was not yet legally formed.

3. The plaintiff's claim that the trial court incorrectly determined that it failed to make a threshold showing of fraud in order to warrant limited discovery and an evidentiary hearing on its motion to open was unavailing: the trial court did not abuse its discretion in denying the plaintiff's motion to open because the plaintiff failed to make a threshold showing of substance warranting the opening of the judgment, that court having correctly determined that, even if the defendant sold the residential units to another entity, this would have had no impact on its judgment rendered in favor of the defendant, as the court determined that the defendant complied with the real estate agreement, and the defendant's interactions with a separate buyer were immaterial to the plaintiff's claims.

Argued March 8—officially released May 31, 2022

*Procedural History*

Action to recover damages for breach of contract, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the defendant filed a counterclaim and a third-party complaint; thereafter, the third-party defendants filed a third-party counterclaim; subsequently, the matter was tried to the court, *Hon. Jon C. Blue*, judge trial referee; judgment for the defendant on the complaint, for the plaintiff on the counterclaim, for the third-party defendants on the third-party complaint, and for the third-party defendant Dragon Bridge Management, LLC, in part on its third-party counterclaim, from which the plaintiff and the third-party counterclaim plaintiffs appealed to this court; thereafter, the court, *Hon. Jon C. Blue*, judge trial referee, denied the plaintiff's motion to open the judgment, and the plaintiff filed a separate appeal to this court; subsequently, the third-party counterclaim plaintiff Eduardo Perez withdrew his appeal; thereafter, this court consolidated the appeals. *Affirmed.*

*Danielle J. B. Edwards*, for the appellant in Docket Nos. 44218 and 44656 (plaintiff).

*Peter V. Lathouris*, with whom, on the brief, was *Victor Andreou*, for the appellant in Docket No. 44218 (third-party defendant Dragon Bridge Management, LLC).

*Scott E. Jackson*, for the appellee in Docket Nos. 44218 and 44656 (defendant).

*Opinion*

BISHOP, J. These consolidated appeals arise from a dispute among the plaintiff, D2E Holdings, LLC (D2E Holdings), the defendant, third-party plaintiff, and third-party counterclaim defendant, Corporation for Urban Home Ownership of New Haven (CUHO), and the third-party defendant and third-party counterclaim plaintiff, Dragon Bridge Management, LLC (Dragon Bridge).[1] In Docket No. AC 44218, D2E Holdings and Dragon Bridge appeal from the judgment of the trial court, rendered after a trial to the court, in favor of CUHO. In Docket No. AC 44656, D2E Holdings appeals from the judgment of the trial court denying its motion to open the judgment in favor of CUHO.[2] The parties advance three claims in their appeals. In AC 44218, D2E Holdings claims that the court improperly rendered judgment in favor of CUHO on D2E Holdings' breach of the implied covenant of good faith and fair dealing claim; in the same docket, Dragon Bridge claims that the court improperly rendered judgment in favor of CUHO on Dragon Bridge's breach of contract counterclaim. In AC 44656, D2E Holdings claims that the court incorrectly determined that it failed to make a threshold showing of fraud in order to warrant limited discovery and an evidentiary hearing on its motion to open. We affirm the judgments of the court.

The following factual findings of the court and procedural history are relevant to the issues raised in this appeal. The present dispute stems from two separate but related contracts: a property management agreement between CUHO and Dragon Bridge, and a real estate contract between CUHO and D2E Holdings.

On March 7, 2017, CUHO and Dragon Bridge attempted to enter into an exclusive property management agreement. In the management agreement, Dragon Bridge, designated in the agreement as the "MANAGER," agreed to be CUHO's "exclusive managing agent to rent, lease, operate, maintain, manage, and supervise and coordinate the rental, leasing, operation, and maintenance" of specified properties owned by CUHO in exchange for a payment of $7000 per month. The management agreement also contained a liquidated damages provision in which CUHO agreed to pay Dragon Bridge twelve months of management fees in the event that CUHO prematurely terminated the management agreement. Dragon Bridge, however, did not exist as a corporate entity on the date that the management agreement was executed, March 7, 2017, because it was not incorporated until March 14, 2017. Eduardo Perez was "employ[ed] . . . as a manager" of Dragon Bridge. Perez signed the management agreement, despite the fact that Perez was not individually named as a party to the management agreement.[3] Nevertheless, between April, 2017, and October, 2017, Dragon Bridge provided services to CUHO pursuant to the management agree-

ment, and CUHO paid Dragon Bridge for a majority of its services. In October, 2017, or November, 2017, CUHO asked Dragon Bridge not to return to its property.

On October 3, 2017, D2E Holdings and CUHO entered into a real estate contract, through which D2E Holdings agreed to purchase from CUHO seventy-three residential units in New Haven in exchange for $2,900,000. The real estate contract contained a financial contingency provision in § 3.3 (a) that required D2E Holdings to obtain "a commitment from a recognized lending institution to provide purchase money mortgage financing" on or before October 31, 2017. Section 3.1 of the real estate contract mandated that CUHO provide to D2E Holdings sixteen types of statements, including those regarding income and expenses, "[t]o the extent such documents are existing and available . . . ." Sections 2.2 (a) and 6.1 of the real estate contract required D2E Holdings to provide CUHO with an initial deposit of $100,000, which could be retained by CUHO if D2E Holdings defaulted on any of its obligations.

In accordance with these provisions in the real estate contract, D2E Holdings provided CUHO's attorney with $100,000 as an initial deposit. D2E Holdings also requested that CUHO provide it with certain documents so that it could obtain financing from Liberty Bank. CUHO supplied D2E Holdings with all of the documents that were required pursuant to the real estate contract, but did not provide all of the documents requested by D2E Holdings because those documents "did not yet exist" and could not be created by the closing date. Consequently, D2E Holdings never submitted a full mortgage loan application, never obtained mortgage financing, and the November 30, 2017 closing date expired without a closing.

The parties thereafter engaged in the underlying litigation stemming from the management agreement and the real estate contract. D2E Holdings instituted an action by way of a complaint against CUHO, alleging that CUHO breached the covenant of good faith and fair dealing implied in the real estate contract by failing to provide D2E Holdings with the necessary documents for it to secure mortgage financing and by retaining D2E Holdings' initial deposit without actual intent to transfer title to the subject units. In that action, D2E Holdings sought specific performance of conveyance of title and "[a]ctual damages . . . ." After being impleaded by way of a third-party complaint filed by CUHO, Dragon Bridge filed a counterclaim against CUHO, alleging that CUHO breached the management agreement and was unjustly enriched when it failed to pay Dragon Bridge all of the fees for its services. In its counterclaim, Dragon Bridge claimed that it suffered damages in the amount of $96,200, on the basis of the liquidated damages provision in the management agreement.

On March 3 and 5, 2020, all of the parties' claims were tried to the court, and the court issued a memorandum of decision on August 6, 2020. Through its memorandum of decision, the court found in favor of CUHO as to D2E Holdings' breach of the implied covenant of good faith and fair dealing claim because it concluded that CUHO had no obligation to provide D2E Holdings with financial documents that did not exist at the time the real estate contract was executed. The court also found in favor of CUHO as to Dragon Bridge's breach of contract claim on the ground that the management agreement was a "nullity" because Dragon Bridge was a nonexistent entity on the date that the management agreement was executed. The court, nevertheless, rendered judgment in the amount of $7000 against CUHO on Dragon Bridge's unjust enrichment claim for the services provided by Dragon Bridge for one month, which represented the unpaid services that Dragon Bridge provided. D2E Holdings and Dragon Bridge then filed this appeal.

During the pendency of this appeal, D2E Holdings, on March 11, 2021, filed a motion to open seeking to vacate the trial court's judgment in favor of CUHO. In support of its motion, D2E Holdings contended that CUHO engaged in fraud by concealing in discovery that it had sold the subject rental units to another entity for a higher price. On April 6, 2021, the court issued a memorandum of decision denying D2E Holdings' motion to open. The court concluded that CUHO's "allegedly impure motives and the existence or nonexistence of any side deals are legally irrelevant" because the court specifically found in its memorandum of decision that CUHO had complied with the real estate contract. D2E Holdings filed a separate appeal from the trial court's denial of its motion to open, and this court consolidated both appeals. Additional facts will be set forth as necessary.

I

D2E Holdings claims on appeal that the court improperly rendered judgment for CUHO on D2E Holdings' breach of the implied covenant of good faith and fair dealing claim. Specifically, D2E Holdings argues that the court incorrectly determined that CUHO did not act in bad faith by failing to create and provide to D2E Holdings the documents necessary for D2E Holdings to obtain mortgage financing, and by accepting D2E Holdings' initial deposit without the intent to transfer title to the subject units. We are not persuaded.

We begin with the applicable standard of review and relevant legal principles that govern the resolution of this claim. Although D2E Holdings frames its claim as challenging the legal standard used by the court, the whole of its argument reveals that its claim challenges the court's application of the standard to the evidence

presented at trial. See, e.g., *State* v. *Acker*, 160 Conn. App. 734, 741–42, 125 A.3d 1057 (2015) (reframing claim on appeal on basis of content of appellant's brief, despite title of claim, stated standard of review, and characterization of claim used by appellant), cert. denied, 320 Conn. 915, 131 A.3d 750 (2016). We apply plenary review to this claim because the issue of whether undisputed facts meet a particular legal standard is a question of law.[4] *Burns* v. *Adler*, 325 Conn. 14, 33, 155 A.3d 1223 (2017). Likewise, to the extent we are required to interpret the real estate contract, the language of which is plain and unambiguous, our review also is plenary. See *Gallagher* v. *Fairfield*, 339 Conn. 801, 807, 262 A.3d 742 (2021).

"[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." (Internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, 322 Conn. 385, 399, 142 A.3d 227 (2016). "Essentially [the implied covenant of good faith and fair dealing] is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy." (Internal quotation marks omitted.) Id., 399 n.11. "[S]tated otherwise, the claim [that the implied covenant has been breached] must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty . . . ." (Internal quotation marks omitted.) Id., 399.

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Internal quotation marks omitted.) *Dorfman* v. *Smith*, 342 Conn. 582, 597, 271 A.3d 53 (2022). "Bad faith in general implies . . . actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose. . . . [B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain . . . ." (Cita-

tion omitted; internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, supra, 322 Conn. 399–400; see also *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 567, 479 A.2d 781 (1984) (party does not act in bad faith by complying with "the clearly expressed terms of a contract").

In *Financial Freedom Acquisition, LLC* v. *Griffin*, 176 Conn. App. 314, 341, 170 A.3d 41, cert. denied, 327 Conn. 931, 171 A.3d 454 (2017), this court held that a party's implied covenant claim fails when it is contingent on a misinterpretation of a contractual provision. In *Griffin*, the defendants' implied covenant claim was predicated on a provision in a "note prescribing the date on which repayment of the loan was due." Id. The defendants construed the "provision as granting the executrix a right to unilaterally extend the repayment deadline and as imposing upon the named plaintiff an obligation to honor the executrix's unilateral decision to extend the deadline." Id. This court rejected the defendants' construction and held that the plaintiff did not breach the implied covenant of good faith and fair dealing because "the unambiguous language of the provision permits, but does not require, the parties to extend the repayment deadline by entering into a separate written agreement." (Emphasis omitted.) Id. This court reasoned that "[t]he defendants mistakenly construe the provision as granting the executrix a right to unilaterally extend the repayment deadline and as imposing upon the named plaintiff an obligation to honor the executrix's unilateral decision to extend the deadline. The provision guarantees no such right to the executrix and imposes no such obligation on the named plaintiff." Id., 341–42. Accordingly, this court concluded that the defendants' implied covenant claim failed because it was "not predicated on a breach of an express term in the note . . . and the named plaintiff's conduct did not impair any contractual right of the decedent or her estate. . . . That is, the note guaranteed no contractual right to an extension to sell the property, and, consequently, the named plaintiff did not breach the terms of the note by never agreeing to such an extension." (Citations omitted.) Id., 342–43.

The court in the present case determined that CUHO did not breach the implied covenant of good faith and fair dealing on the ground that it did not act in bad faith by failing to provide D2E Holdings with documents to secure financing that did not exist at the time the parties entered into the real estate contract. The court set forth the standard for implied covenant claims prescribed by *Geysen*, and reasoned that, "[u]nder the express terms of the [real estate] contract, CUHO had no obligation to provide D2E [Holdings] with documents that did not exist. If D2E [Holdings] had wanted to require CUHO to create hitherto nonexistent documents, it could have placed such an obligation in the [real estate] contract. It did not. There is no evidence

that CUHO accepted the deposit without actual intent to transfer title to the [subject units]." The court further held that "CUHO's retention of the deposit during the course of this litigation violates neither the express terms of the [real estate] contract nor the implied covenant of good faith and fair dealing. That sum was deposited 'as an initial deposit . . . to be applied to the [p]urchase [p]rice, concurrently with the execution of this [real estate] [c]ontract.' Section 2.2 (a). It is also 'to be credited against [any] liquidated damages sum.' Section 6.1. Under these circumstances, judgment on the second count must enter for [CUHO]."

On the basis of the foregoing, we conclude that the court correctly determined that CUHO did not breach the implied covenant of good faith and fair dealing. As the court aptly held, the plain language of the real estate contract belies D2E Holdings' claim because it does not mandate that CUHO create nonexistent documents. The real estate contract unambiguously provides in § 3.1 that, "[t]o the extent such documents are existing and available to [CUHO] and to the extent such information has not been previously provided, [CUHO] shall provide copies of [certain] documents to [D2E Holdings] within five (5) days after the date that a full and complete executed original of this [real estate] [c]ontract is received by [D2E Holdings] . . . unless such documents have been previously delivered to [D2E Holdings] . . . ." There is no language in this provision, or otherwise in the real estate contract, mandating that CUHO create nonexistent documents and provide them to D2E Holdings. Rather, § 3.1 mandates the precise opposite: that CUHO must provide D2E Holdings with documents that "are *existing* and *available* . . . ." (Emphasis added.) Just as in *Griffin*, CUHO's "conduct did not impair any contractual right" because the real estate contract did not obligate CUHO to create nonexistent documents. *Financial Freedom Acquisition, LLC* v. *Griffin*, supra, 342.

Accordingly, D2E Holdings' implied covenant claim contradicts § 3.1 of the real estate contract because it seeks to mandate that CUHO create and provide documents that are *not existing* and *not available*. Our Supreme Court has made clear that the implied covenant of good faith and fair dealing cannot be applied to achieve a "result contrary to the clearly expressed terms of a contract . . . ." (Internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, supra, 322 Conn. 399 n.11.[5] If D2E Holdings wanted to ensure that CUHO create all documents required for it to obtain financing, including those that did not exist, it could have included that language in the real estate contract. In the absence of such a mandate, CUHO did not breach the implied covenant of good faith and fair dealing, as it could not have engaged in "actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty

or some contractual obligation" because there was no contractual obligation mandating that it create documents for D2E Holdings. (Internal quotation marks omitted.) Id., 399–400; *Financial Freedom Acquisition, LLC* v. *Griffin,* supra, 176 Conn. App. 341–43.

We reach the same conclusion as to CUHO's retention of D2E Holdings' initial deposit. CUHO did not act in bad faith by retaining D2E Holdings' deposit because the express terms of §§ 2.2 (a) and 6.1 of the real estate contract permitted CUHO to retain the initial deposit in the event that D2E Holdings defaulted. In the present case, it is undisputed that D2E Holdings was unable to obtain mortgage financing to comply with § 3.3 (a) of the real estate contract and, thus, D2E Holdings defaulted on its contractual obligations. CUHO's retention of that initial deposit cannot be the basis for D2E Holdings' implied covenant claim because the real estate contract expressly permitted CUHO to do so. See *Geysen* v. *Securitas Security Services USA, Inc.*, supra, 322 Conn. 399. Therefore, we conclude that the court correctly determined that D2E Holdings failed to prevail on its implied covenant claim against CUHO.

## II

Dragon Bridge claims on appeal that the court improperly rendered judgment for CUHO on Dragon Bridge's breach of contract third-party counterclaim. Particularly, Dragon Bridge argues that the court incorrectly determined that the management agreement between Dragon Bridge and CUHO was a " 'nullity . . . .' " For the reasons set forth below, we are unable to review Dragon Bridge's claim.

The court determined that Dragon Bridge failed to prevail on its breach of contract counterclaim against CUHO on the ground that the management agreement was a nullity because Dragon Bridge did not yet exist at the time of its execution. The court found: "The first count of the counterclaim in the third-party action alleges breach of contract. It specifically alleges that CUHO breached the [management] agreement in that it: (a) failed to pay Dragon Bridge the management fee for the month of October, 2017, (b) failed to pay Dragon Bridge 'the early termination fee,' and (c) failed to provide 'the required information and documents.' The second special defense alleges that Dragon Bridge did not exist on March 7, 2017, when the [management] agreement was signed. The evidence establishes that Dragon Bridge was incorporated on March 14, 2017, the date its articles of incorporation were filed with the Secretary of the State. . . . A corporation begins 'its corporate existence' on the day that its certificate of incorporation is filed with the Secretary of the State. *DiFrancesco* v. *Kennedy*, 114 Conn. 681, 687, 160 A. 72 (1932). '[I]t then became at least a de facto corporation.' Id. Prior to that time, it had no corporate existence. Under these circumstances, the [management] agreement was a nul-

lity. [Dragon Bridge] may nevertheless be entitled for compensation for work that it actually performed, but that entitlement is addressed with respect to the second count [alleging unjust enrichment]. Under these circumstances, judgment must enter for [CUHO] on the first count." (Citation omitted.)

On appeal, Dragon Bridge does not contest the court's determination that it was not in existence at the time the management agreement was executed. Rather, Dragon Bridge makes three principal arguments[6] to support its ability to enforce the management agreement against CUHO. First, Dragon Bridge argues that, pursuant to *BRJM, LLC* v. *Output Systems, Inc.*, 100 Conn. App. 143, 152, 917 A.2d 605, cert. denied, 282 Conn. 917, 925 A.2d 1099 (2007) (*BRJM*), the management agreement was not a "nullity" because Perez had the capacity to enter into the management agreement on behalf of Dragon Bridge. Second, Dragon Bridge argues that it had the authority to enforce the management agreement against CUHO because Perez assigned the agreement to Dragon Bridge after it was legally formed. Third, Dragon Bridge argues that CUHO effectively ratified the management agreement when it accepted the services of Dragon Bridge for seven months. The trial court did not review or assess any of these fact bound arguments. Accordingly, we conclude that the record is inadequate to consider all three of Dragon Bridge's arguments because the trial court never made the requisite determination as to the issues of Perez' capacity, never made the requisite findings and determinations as to Perez' assignment and CUHO's ratification, and because Dragon Bridge failed to seek reargument or an articulation as to any of these grounds.

Turning to the basis on which the court made its findings, we note first that the standard of review applicable to the court's ultimate legal conclusion as to the capacity of an individual or entity to enter into a contract is a question of law subject to plenary review. See *BRJM, LLC* v. *Output Systems, Inc.*, supra, 100 Conn. App. 152.

We begin our analysis with a review of this court's decision in *BRJM*. In that case, Nicholas Kepple, purportedly acting on behalf of M & K Realty, LLC, executed a land purchase agreement with the individual seller, Howard Engelsen. Id., 145. Although Kepple intended to form M & K Realty, LLC, at the time of the transaction, that entity was never formed and it never had a legal existence. Id., 146. Kepple accordingly assigned the land purchase agreement to another one of his corporate entities, BRJM, LLC. Id., 146 and n.3. Engelsen later withdrew from the land purchase agreement due to appraisal issues. Id., 146–47. BRJM, LLC, consequently filed an action against Engelsen seeking specific performance of the land purchase agreement and money damages. Id., 147. After trial, the trial court held that M &

K Realty, LLC, despite its nonexistence, had the capacity to enter into the land purchase agreement. Id. Engelsen appealed from the trial court's judgment, arguing that M & K Realty, LLC, lacked capacity to enter into the land purchase agreement because it never existed as a legal entity and, thus, the assignment to BRJM, LLC, was void. Id.

This court held on appeal in *BRJM*, as a matter of first impression, that "an entity does not have the legal capacity to contract prior to its legal existence," and that "a contract entered into prior to an entity's formation is not void ab initio due to lack of capacity because the individual entering into the contract on behalf of the unformed entity has the requisite capacity. It follows that, in the situation of an unformed entity, the individual serves as the party to the contract although the contract is entered into in the entity's name." Id., 152. Applying this rule, this court in *BRJM* reasoned that, "[a]lthough . . . the entity designated as M & K Realty, LLC, did not legally exist and, therefore, lacked the capacity to enter into the agreement, Kepple, acting as an individual on behalf of M & K Realty, LLC, did have capacity to contract with the defendant." Id., 151–52. The court concluded that "Kepple, acting in his individual capacity and as a party to the agreement, made a valid assignment of the agreement to [BRJM, LLC], an existing entity." Id., 154–55.[7]

Applying *BRJM*, we conclude that Dragon Bridge lacked capacity to enter into the management agreement because it is undisputed that it did not exist as a corporate entity at the time the management agreement was executed. Unlike the trial court, however, we conclude that Dragon Bridge's lack of capacity does not, by itself, render the management agreement a "nullity." Instead, the management agreement *may be enforceable* between Perez and CUHO if Perez had the "requisite capacity" to execute the management agreement acting as an individual on behalf of the named but nonexistent entity, Dragon Bridge. See, e.g., id., 153–54 (holding that "prerequisite" to acquisition of preincorporation rights is capacity of individual signee to contract, and that individual had capacity to enter into land purchase agreement as "member" of nonexistent limited liability company). Accordingly, the threshold issue is whether Perez had the requisite capacity to enter into the management agreement on behalf of Dragon Bridge.[8]

However, the issue of Perez' capacity to enter into the management agreement on behalf of Dragon Bridge was not determined by the court. The court's factual findings as to Perez were limited to the following: Perez signed the management agreement, Perez was not named as a party to the management agreement, and Dragon Bridge "employs Perez as a manager." The court did not make a determination as to whether these facts

were sufficient to provide Perez with the capacity to enter into the management agreement on behalf of Dragon Bridge. As noted, even assuming that Perez had capacity to enter into the management agreement on behalf of Dragon Bridge, the court did not make any findings or determinations as to Dragon Bridge's second and third arguments with respect to the issues of assignment and ratification.

It is well established that a party cannot obtain appellate review of a claim challenging a finding or determination that the court did not make. "It is the responsibility of the appellant to provide an adequate record for review." (Internal quotation marks omitted.) *State* v. *Walker*, 319 Conn. 668, 678, 126 A.3d 1087 (2015). "It is well established that [a]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal." (Internal quotation marks omitted.) Id., 680; see also Practice Book § 66-5. "Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the appellant's claims] would be entirely speculative." (Internal quotation marks omitted.) *Acadia Ins. Co.* v. *O'Reilly*, 138 Conn. App. 413, 418, 53 A.3d 1026 (2012), cert. denied, 308 Conn. 904, 61 A.3d 1097 (2013); see id., 419 (holding that this court does not "presume error on the part of the trial court; error must be demonstrated by an appellant" (internal quotation marks omitted)). "It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . *or to ask the trial judge to rule on an overlooked matter*. . . . In the absence of any such attempts, we decline to review this issue." (Emphasis added; internal quotation marks omitted.) *Brennan* v. *Brennan Associates*, 316 Conn. 677, 705, 113 A.3d 957 (2015).

In *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 231–32, 828 A.2d 64 (2003),[9] the plaintiffs argued on appeal that the trial court incorrectly determined the date on which certain actions accrued for purposes of the statute of limitations. The plaintiffs raised the same arguments before the trial court, however, "the record [was] silent with respect to the trial court's treatment of these specific claims" because "the trial court did not discuss the statute of limitations issues in rendering its . . . decision." Id., 232–33. Our Supreme Court declined to review the plaintiffs' statute of limitations arguments on appeal because "the plaintiffs never

remedied this defect in the record by moving for articulation or rectification of the trial court's decision" and, thus, "leaves us with the inappropriate task of speculating about the trial court's reasoning . . . ." Id., 233; see also, e.g., *Stiffler* v. *Continental Ins. Co.*, 288 Conn. 38, 52–53, 950 A.2d 1270 (2008) (declining to review claim on appeal in absence of articulation when trial court's decision entirely failed to address party's claim); *Ravetto* v. *Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 731, 941 A.2d 309 (2008) (declining to review claim on appeal in absence of articulation when trial court's decision failed to address claim).

Here, the court determined *only* that the management agreement was a nullity because Dragon Bridge was not yet legally formed.[10] If the court had considered arguments relating to assignment and/or ratification and rejected them, we cannot locate in the court's memorandum of decision any factual findings that, if found, could be subject to review. This is particularly true in the present case because assignment and ratification primarily are factual issues.[11] See *Sunset Gold Realty, LLC* v. *Premier Building & Development, Inc.*, 133 Conn. App. 445, 452, 36 A.3d 243 (validity of assignment of contract generally is question of fact), cert. denied, 304 Conn. 912, 40 A.3d 319 (2012); *Bank of Montreal* v. *Gallo*, 3 Conn. App. 268, 276, 487 A.2d 1101 ("[r]atification is a question of fact"), cert. denied, 195 Conn. 803, 491 A.2d 1103 (1985).

To the extent the court's decision was ambiguous or deficient in any regard, a determination we do not make, Dragon Bridge failed to file a motion to reargue, a motion for clarification, or a motion for articulation seeking to have the trial court make any of the requisite findings or determinations.[12] See *Von Kohorn* v. *Von Kohorn*, 132 Conn. App. 709, 714–15, 33 A.3d 809 (2011) (outlining procedural mechanisms for modifying trial court judgment, including motions for clarification, reargument, and to open); see also, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 232–33. Accordingly, we decline to review Dragon Bridge's claim on appeal.

III

D2E Holdings finally claims on appeal that the court incorrectly concluded that it failed to make a threshold showing of fraud in order to warrant limited discovery and an evidentiary hearing on its motion to open. D2E Holdings argues that the court's decision denying D2E Holdings' motion to open improperly applied an "illegal standard . . . ." We disagree.

The following additional facts are relevant to the resolution of this claim. On March 11, 2021, D2E Holdings filed a motion to open and vacate the trial court's judgment, rendered after a trial to the court, in favor of CUHO, on the ground that CUHO engaged in fraud.

In support of this motion, D2E Holdings filed a memorandum of law as well as several hundred pages of exhibits purporting to show that CUHO engaged in fraud by concealing in discovery that it had sold the subject rental units to another entity for a higher price. D2E Holdings claimed that it recently discovered, on the basis of land records recorded several years prior to trial, that CUHO and its agents concealed in discovery that it sold the subject units for approximately $100,000 more than it was offered to D2E Holdings. D2E Holdings argued that this "new" evidence warranted the opening of the judgment and that "[t]his cure is appropriate here and now because D2E [Holdings] satisfies the standard for doing so set forth in *Chapman Lumber, Inc.* v. *Tager*, [288 Conn. 69, 106–107, 952 A.2d 1 (2008)]. In opposition, CUHO argued that this evidence was not "new" because it was publically recorded on the land records long before trial, this evidence would not affect the court's judgment, and D2E Holdings failed to make a sufficient threshold showing pursuant to *Tager*. D2E Holdings replied that CUHO's motive in voiding the real estate contract was directly relevant to its implied covenant claim, and that its evidence satisfies the threshold standard pursuant to *Tager*.

On April 6, 2021, the court, without holding oral argument,[13] issued a memorandum of decision denying D2E Holdings' motion to open, primarily on the ground that the fraud D2E Holdings attempted to establish was "legally irrelevant" to its claims at trial. The court reasoned that, even if D2E Holdings' contentions were true and CUHO concealed an agreement to sell the property to another buyer, this point "would not affect the court's decision" rendering judgment for CUHO. The court held that D2E Holdings "essentially seeks discovery regarding [CUHO's] underlying motives in its dealings with [D2E Holdings]. In a breach of contract claim, however, the issue is whether [CUHO] failed to perform its obligations pursuant to the terms of the contract. The court has specifically found that [CUHO] did not fail to perform its obligations pursuant to the terms of the contract in question. Under these circumstances, [CUHO's] allegedly impure motives and the existence or nonexistence of any side deals are legally irrelevant." This amended appeal followed.

We next set forth the applicable standard of review and relevant legal principles for this claim. Once again, D2E Holdings advocates that it is challenging only the court's use of an improper legal standard in deciding its motion, and, thus, it claims that plenary review applies. We disagree and, instead, apply an abuse of discretion standard because the gist of D2E Holdings' argument is that the court incorrectly determined that D2E Holdings failed to make a threshold showing to warrant opening the judgment. See *Benjamin* v. *Island Management, LLC*, 341 Conn. 189, 223, 267 A.3d 19 (2021) (disagreeing with appellant's contention that ple-

nary review applied because its arguments "effectively challenge[d]" propriety of court's decision and, thus, "abuse of discretion standard [was] more apt"). "We do not undertake a plenary review of the merits of a decision of the trial court to grant or to deny a motion to open a judgment. The only issue on appeal is whether the trial court has acted unreasonably and in clear abuse of its discretion." (Internal quotation marks omitted.) *U.S. Bank National Assn.* v. *Rothermel*, 339 Conn. 366, 382, 260 A.3d 1187 (2021). "A motion to open and vacate a judgment . . . is addressed to the [trial] court's discretion, and the action of the trial court will not be disturbed on appeal unless it acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. . . . The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did." (Internal quotation marks omitted.) *Stanley* v. *Woodard*, 211 Conn. App. 127, 129–30, 271 A.3d 1137 (2022).

"Courts have an inherent power to open, correct and modify judgments. . . . A civil judgment of the Superior Court may be opened if a motion to open or set aside is filed within four months of the issuance of judgment." (Internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, supra, 288 Conn. 106; see also General Statutes § 52-212a;[14] Practice Book § 17-4 (a).[15] "A motion to open in order to permit a party to present further evidence need not be granted where the evidence offered is not likely to affect the verdict. . . . Newly-discovered evidence which is merely cumulative, or which impeaches the . . . credibility of a witness, will not suffice ordinarily to grant a new trial, and never unless it appears reasonably certain that injustice has been done in the judgment rendered, and that the result of a new trial will probably be different. . . . When a party seeks to open and vacate a judgment based on new evidence allegedly showing the judgment is tainted by fraud, he must show, inter alia, that he was diligent during trial in trying to discover and expose the fraud, and that there is clear proof of that fraud." (Citations omitted; internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, supra, 106–107; see also *Reville* v. *Reville*, 312 Conn. 428, 441, 93 A.3d 1076 (2014) (explaining standards for fraud). "These rules are motivated by the policy that [o]nce a judgment [is] rendered it is to be considered final and it should be left undisturbed by [posttrial] motions except for a good and compelling reason. . . . Otherwise, there might never be an end to litigation. (Citation omitted; internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, supra, 107.

To be entitled to a hearing on a motion to open, a party needs "to make some threshold showing that his claims had substance . . . ." Id., 108. This court has

stated that this "threshold showing of substance" requires that a party make a showing of "probable cause" to open the judgment.[16] *Veneziano* v. *Veneziano*, 205 Conn. App. 718, 730, 259 A.3d 28 (2021). "Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false." (Internal quotation marks omitted.) *Malave* v. *Ortiz*, 114 Conn. App. 414, 426, 970 A.2d 743 (2009).

We conclude that the court did not abuse its discretion in denying D2E Holdings' motion to open because D2E Holdings failed to make a threshold showing of substance warranting the opening of the judgment. Although the court did not expressly cite to *Tager* to set forth the standard for a threshold showing required to open a judgment,[17] its decision was not a " 'clear abuse of its discretion.' " *Stanley* v. *Woodard*, supra, 211 Conn. App. 129. Stated simply, we find no disagreement with the court's conclusion, specifically, the fact that D2E Holdings discovered that CUHO sold the subject units to another entity would have had no impact on the court's earlier judgment in favor of CUHO. All of D2E Holdings' claims against CUHO were founded on the real estate contract. The court rendered judgment after trial in favor of CUHO, and expressly held that CUHO complied with the real estate contract provisions and the covenant of good faith and fair dealing implied therein. CUHO's interactions with a separate buyer, as to a distinct contract, and a dissimilar financing process are immaterial to D2E Holdings' claims at trial. This "new" submission does not "affect the [judgment]" because it has no relation to the claims decided at trial.[18] (Internal quotation marks omitted.) *Chapman Lumber*, *Inc.* v. *Tager*, supra, 288 Conn. 106–107.

D2E Holdings' assertions on appeal as to why the judgment needs to be opened undermine its position. D2E Holdings contends that "[o]ne question of critical relevance that remains unknown is whether CUHO treated the new buyer differently than D2E [Holdings]. Specifically, did CUHO [produce] documents to the new buyer that it refused to produce to D2E [Holdings] during its own financing process?" None of this new information warrants opening the judgment because the manner in which CUHO engaged with a separate buyer, after D2E Holdings failed to obtain financing for the same units, " 'is not likely to affect the [judgment].' " *Chapman Lumber*, *Inc.* v. *Tager*, supra, 288 Conn. 106. Likewise, whether and how CUHO's agents disclosed in discovery that CUHO sold the subject units to another buyer when D2E Holdings failed to obtain financing only goes to impeach the credibility of those witnesses, which does not "suffice . . . to grant a new trial . . . ." (Internal quotation marks omitted.) Id., 107. Therefore, indulging every reasonable presumption in favor of the court's decision, we conclude that the court did not clearly abuse its discretion in denying D2E Holdings' motion to open.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] A manager of Dragon Bridge, Eduardo Perez, was named as a third-party defendant and third-party counterclaim plaintiff, and filed this joint appeal with Dragon Bridge. Eduardo Perez, however, later withdrew from this appeal.

[2] D2E Holdings filed a motion to consolidate the appeals in Docket No. AC 44218 and Docket No. AC 44656, which was granted by this court.

[3] It is not clear from the face of the management agreement whether Perez signed on behalf of Dragon Bridge as the party to the agreement designated as "MANAGER," or as the manager of Dragon Bridge.

[4] Although generally "[t]he question of whether certain conduct breached the duty of good faith and fair dealing is a question of fact subject to the clearly erroneous standard of review," D2E Holdings does not contest on appeal the court's factual findings. *Alpha Beta Capital Partners*, *L.P.* v. *Pursuit Investment Management*, *LLC*, 193 Conn. App. 381, 416, 219 A.3d 801 (2019), cert. denied, 334 Conn. 911, 221 A.3d 446 (2020), and cert. denied, 334 Conn. 911, 221 A.3d 446 (2020).

[5] D2E Holdings also argues on appeal that the trial court's application of *Geysen* is in contrast with our Supreme Court's previous recitations of a more "flexible" and "nuanced" implied covenant standard in *Warner* v. *Konover*, 210 Conn. 150, 156, 553 A.2d 1138 (1989), and *Central New Haven Development Corp.* v. *La Crepe*, *Inc.*, 177 Conn. 212, 216, 413 A.2d 840 (1979). We disagree because neither *Warner* nor *La Crepe*, *Inc.*, involved the application of express contract language. See *Warner* v. *Konover*, supra, 153 (implied covenant claim contingent on "absence of a clause in the lease"); *Central New Haven Development Corp.* v. *La Crepe*, *Inc.*, supra, 216 (implied covenant claim contingent on silence of lease as to time within which lessee may cancel). In the present case, unlike *Warner* and *La Crepe*, *Inc.*, D2E Holdings' implied covenant claim is in direct contravention of the express terms of the real estate contract.

[6] Dragon Bridge makes a fourth argument that warrants little discussion. Dragon Bridge contends that its capacity to enter into the management agreement was not an issue at trial because CUHO made a judicial admission in its answer to Dragon Bridge's counterclaim by stating that CUHO "entered into [the] management agreement with one or both of the third-party defendants," and CUHO never disputed the existence of the management agreement. This argument fails because CUHO explicitly asserted in its second special defense to Dragon Bridge's counterclaim that "Dragon Bridge . . . did not exist as an entity on March 7, 2017, and thus was unable to execute a contract or agreement." Furthermore, CUHO's statement that it entered into the management agreement with "*one or both*" of Perez and Dragon Bridge is not so "clear, deliberate and unequivocal" as to constitute a judicial admission that Dragon Bridge was in existence and had the capacity to enter into the management agreement. See *O & G Industries*, *Inc.* v. *All Phase Enterprises*, *Inc.*, 112 Conn. App. 511, 523–24, 963 A.2d 676 (2009) (explaining standards for judicial admissions). CUHO additionally raised the issue of Dragon Bridge's capacity in its written closing argument, in its posttrial brief, and its posttrial reply brief. We therefore summarily reject Dragon Bridge's argument as to CUHO's purported judicial admission.

[7] See *Bernblum* v. *Grove Collaborative*, *LLC*, 211 Conn. App. 746 n.4, A.3d (2022) (noting that *BRJM* "is limited to the issue of whether a contract fails due to the lack of capacity of one of the contracting parties if, at the time the contract is executed, one of the parties to the contract is an unformed limited liability company"), petition for cert. filed (Conn. May 6, 2022) (No. 210413).

[8] Although both Dragon Bridge and CUHO discuss *BRJM* on appeal, neither party advances a substantive argument as to Perez' capacity. CUHO does not argue that Perez lacked capacity; instead, it affirmatively contends that the management agreement "was only enforceable between CUHO and Perez . . . ." Dragon Bridge does not make an express capacity argument, but it does relatedly contend, as part of its separate assignment argument, that "[t]he evidence demonstrates that . . . Perez was the manager of Dragon Bridge."

[9] Dragon Bridge relies on *Schoonmaker* in its appellate brief in support of its assignment argument, but it does not discuss the applicability of *Schoonmaker* as to the reviewability of its claims on appeal.

[10] To be clear, the *finding* by the court that Dragon Bridge "employs Perez as a manager," does not constitute a *determination* that such an employment

provides him the capacity to contract on behalf of Dragon Bridge. See, e.g., *BRJM, LLC* v. *Output Systems, Inc.*, supra, 100 Conn. App. 145, 154 (determining that individual had capacity to enter into agreement on behalf of limited liability company because he was "member" of that company); see also *418 Meadow Street Associates, LLC* v. *Clean Air Partners, LLC*, 304 Conn. 820, 835 n.13, 43 A.3d 607 (2012) (generally delineating difference in limited liability companies between "members" and "managers" (internal quotation marks omitted)).

Compounding this deficiency is the unresolved issue of determining in what capacity Perez signed the management agreement. The management agreement entered into evidence states that it was entered into in the name of "MANAGER, DRAGON BRIDGE MANAGEMENT, a Connecticut LLC," and the management agreement is signed by Perez above the phrase "Manager['s] Name." Even if the court's decision was ambiguous as to this point, it is the duty of the appellant to rectify this deficiency. See, e.g., *Brody* v. *Brody*, 315 Conn. 300, 310, 105 A.3d 997 (2015) (declining "invitation to engage in syntactic exercises" in interpreting court's decision and "instead, read [ambiguous language] to support" court's decision); *Szekeres* v. *Miller*, 123 Conn. App. 578, 583, 2 A.3d 953 (2010) (declining to review claim on appeal in absence of articulation when trial court's ruling "at no time fleshed out" standard, rendering its ruling ambiguous); see also *Molaver* v. *Thomas*, 125 Conn. App. 88, 94, 6 A.3d 232 (2010) (declining to review claim on appeal in absence of articulation when it was unclear from memorandum of decision whether trial court made requisite finding).

[11] For instance, the parties' briefs on appeal as to the assignment of the management agreement disagree as to: (1) the applicable statutory scheme to determine which individual may act on behalf of a limited liability company, as Connecticut Limited Liability Company Act, General Statutes (Rev. to 2017) § 34-100 et seq. was repealed and replaced by the Connecticut Uniform Limited Liability Company Act, General Statutes § 34-243 et seq.; (2) whether the terms of the management agreement permitted assignment; (3) whether Dragon Bridge was member-managed or manager-managed, as its operating agreement was not entered into evidence; (4) whether the purported sole member of Dragon Bridge, Danibel Aviles, was the only individual with the capacity to assign the management agreement; and (5) whether Perez, as an agent for Dragon Bridge, assigned the management agreement to Dragon Bridge through the performance of duties for CUHO. Similar disagreements exist as to CUHO's alleged ratification of the management agreement. The trial court never made any findings or determinations as to any of these issues and, accordingly, we decline to engage in speculation to resolve these arguments for the first time on appeal.

[12] We note that Dragon Bridge properly preserved its arguments before the trial court as to the applicability of *BRJM*, as to assignment, and as to ratification. On appeal, however, Dragon Bridge failed to comply with its duty as the appellant to rectify or to otherwise compel the trial court to address these issues, which were not addressed in the trial court's memorandum of decision.

[13] D2E Holdings filed a request for oral argument on its motion to open, to which CUHO objected. The court did not explicitly rule on either of these submissions.

[14] General Statutes § 52-212a provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . ."

[15] Practice Book § 17-4 (a) provides: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, any civil judgment or decree rendered in the Superior Court may not be opened or set aside unless amotiontoopenor set aside is filed withinfourmonthssucceeding the date on which notice was sent. The parties may waive the provisions of this subsection or otherwise submit to the jurisdiction of the court."

[16] D2E Holdings invites this court to "clarify" the "proper standard of review of a motion to open judgment based on allegations of fraud" because it perceives some tension between *Tager* and this court's repeated use of the probable cause standard. (Internal quotation marks omitted.) We decline D2E Holdings' invitation because we perceive no ambiguity in the applicable standards, and it would require us to disregard our Supreme Court's precedent and to overturn a decision of another panel of this court. See, e.g., *State* v. *Bouvier*, 209 Conn. App. 9, 43 n.21, 267 A.3d 211 (2021), cert. denied,

341 Conn. 903, 269 A.3d 789 (2022).

[17] As fully explained in part II of this opinion, if the legal basis of the court's memorandum of decision is absent or unclear, it is the duty of the appellant to rectify this deficiency. See *Deroy* v. *Estate of Baron*, 136 Conn. App. 123, 129–30, 43 A.3d 759 (2012) ("the failure of an appellant to seek an articulation requires the presumption that the trial court considered all of the facts before it and applied the correct legal standard" (internal quotation marks omitted)). As D2E Holdings did not file a motion for articulation or otherwise attempt to compel the court to identify the legal standard it used, we presume that the court acted properly.

[18] Although not explicitly stated by the trial court, the exercise of its discretion denying D2E Holdings' motion to open is further supported on the ground that D2E Holdings was not "diligent" in discovering the "new evidence" that formed the basis of its motion to open. *Chapman Lumber, Inc.* v. *Tager*, supra, 288 Conn. 107. The foundation for D2E Holdings' claim is CUHO's public recordation on the land records of the right of first refusal on December 21, 2017, which was several years prior to trial and only weeks after the commencement of this action. The discovery of a public land record does not constitute "new evidence" and D2E Holdings does not attempt to explain why it first discovered this filing after the trial held in March, 2020.